**UNITED STATES of America,**

v.

**William Berk HARROLD, III, et al., Defendants.**

Criminal File No. 1:09–CR–19–TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 17, 2009.

Katherine Monahan Hoffer, Matthew Turner Jackson, U.S. Attorney's Office, Atlanta, GA, for Plaintiff.

Jay Lester Strongwater, Law Office of Jay L. Strongwater, Colin M. Garrett, Federal Defender Program, Atlanta, GA, David Ross MacKusick, Office of David R. MacKusick, Stockbridge, GA, for Defendants.

## ORDER

THOMAS W. THRASH, JR., District Judge.

This is a criminal case. It is before the Court on the Report and Recommendation [Doc. 125] of the Magistrate Judge recommending that the Motions to Suppress Statements [Doc. 74, 83] should be granted in part and denied in part and that the Supplemental Motion to Suppress Statements [Doc. 103] should be denied. The Court approves and adopts the Report and Recommendation as the judgment of the Court. The Motions to Suppress Statements [Doc. 74, 83] are GRANTED in part and DENIED in part. The Supplemental Motion to Suppress Statements [Doc. 103] is DENIED.

## ORDER FOR SERVICE OF MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' PRETRIAL MOTIONS

RUSSELL G. VINEYARD, United States Magistrate Judge.

Attached is the Report and Recommendation of the United States Magistrate

Judge made in accordance with 28 U.S.C. § 636(b)(1) and this Court's Local Criminal Rule 58.1(A)(3)(a) and (b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within ten (10) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript of applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay,* 714 F.2d 1093, 1095 (11th Cir.1983).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced ten (10) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED,** this 3rd day of November, 2009.

1. Harris filed an initial motion to suppress evidence, [Doc. 45], which is not before the undersigned. At the evidentiary hearing on July 28, 2009, counsel for both parties stated that they did not wish to proceed on the initial motion to suppress at that time, and the motion was deferred to Judge Thrash. [Doc. 109 at 2]. The evidentiary hearing covered only issues pertaining to the supplemental motion to suppress statements. *See* [*id.*].

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' PRETRIAL MOTIONS

Defendants Zachery Harris ("Harris"), Shantavia Glass ("Glass"), and William Berk Harrold, III ("Harrold") have been indicted on charges of bank robbery in violation of 18 U.S.C. § 2113(a), (d) and using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). [Doc. 28]. Harris and Glass have filed motions to suppress evidence.[1] [Docs. 74, 83, & 103]. After evidentiary hearings on the motions,[2] the parties filed post-hearing briefs. [Docs. 106, 110, 113, & 118]. For the following reasons, the undersigned **RECOMMENDS** that Harris' motion, [Doc 103], be **DENIED,** and that Glass' motion [Docs. 74 & 83] be **GRANTED IN PART** and **DENIED IN PART.**

### I. STATEMENT OF FACTS

**A. Facts Relating to Glass' Motion to Suppress, [Docs. 74 & 83]**

On December 17, 2008, a Bank of America branch on Panola Road was robbed. [Doc. 105 at 5]. Federal Bureau of Investigation ("FBI") agents who were investigating the robbery obtained surveillance photographs from a sports store located next to the bank branch. [*Id.*]. The photographs were taken just prior to the bank robbery and showed four individuals, including a female later identified as Glass. [*Id.* at 5–6, 12]. The surveillance photographs were shown on the evening news on December 17, 2008. [*Id.* at 6].

2. The evidentiary hearing transcripts will hereinafter be cited according to document number. *See* [Doc. 105 (6/25/09 hearing on Glass' motion), Doc. 104 (6/30/09 hearing on Glass' motion), Doc. 109 (hearing on Harris' motion)]. In addition, the government and Harris both submitted exhibits, which will be referred to as "(Gov. Ex. ____)" for the government's exhibit and "(Def. Ex. ____)" for Harris' exhibit.

Glass and members of her family saw her picture on the news. [Doc. 104 at 10–11, 23]. Glass contacted a DeKalb County Police Department ("DCPD") officer about the bank robbery that evening, and he told Glass that he did not have any information about the case and that she would need to speak with the detective investigating the robbery. [*Id.* at 7]. Glass agreed and said that she would come to the DCPD station, but she encountered car trouble. [*Id.* at 6–7]. The DCPD officer with whom Glass had spoken picked Glass up and brought her to the station. [*Id.* at 7].

FBI Special Agent Cynthia Myers ("Agent Myers") was at the DCPD station when Glass arrived there between 8:30 and 9:00 p.m. on December 17, 2008. [Doc. 105 at 6–7]. The DCPD officer escorted Glass to the detective division. [*Id.* at 30]. Glass was not handcuffed, but she was placed in a locked interview room while Agent Myers spoke with the other detectives and the officer who escorted Glass to the station. [*Id.* at 30–31]. According to Agent Myers, the DCPD officer had no conversation with Glass regarding the case, apart from telling her that he had no knowledge of the case and she would need to speak with the detectives. [*Id.* at 7–8]. At some point before Agent Myers and another FBI agent, Special Agent Perry Meador ("Agent Meador"), began their interview of Glass, her wallet and identification were taken and placed on a table located just outside of the interview room. [*Id.* at 31–32].

Glass sat in the interview room until approximately 9:15 p.m., when Agents Myers and Meador began to interview her. [*Id.* at 33]. The agents were dressed in plain clothes and were not armed. [*Id.* at 9]. Glass was not handcuffed, and the door was closed but not locked during the interview. [*Id.* at 9–10, 34–35]. The agents identified themselves and told Glass that

they wanted to show her some pictures and discuss what had happened earlier that day. [*Id.* at 11]. The agents first asked Glass questions regarding her address, employment history, and other biographical information. [*Id.* at 12]. Agent Myers then showed Glass a photograph from the sports store surveillance camera that depicted only three men. [*Id.*]. Glass told the agents "a little bit about her encounter with those three men earlier that day." [*Id.* at 13]. Agent Myers showed Glass a photograph of the female from the sports store surveillance camera, and Glass identified herself. [*Id.* at 12]. At that point, the agents decided to read Glass her *Miranda*[3] warnings. [*Id.* at 13].

Before reading the *Miranda* warnings, Agent Myers went through her usual procedure of verifying that the suspect can understand, read, and speak English, asking about the suspect's educational background, and asking whether the suspect is under the influence of any drugs. [*Id.* at 13–14]. Glass verified that she had graduated from high school and could read, speak, and understand English. [*Id.* at 14]. Glass also stated that she was not under the influence of any drugs, but that she was diabetic. [*Id.*]. The agents asked if Glass felt okay and could continue with the interview, and Glass stated that she was fine. [*Id.* at 15]. Agent Myers told Glass that they could get her something to eat or drink during a break, and Glass said that would be fine. [*Id.*].

The agents read Glass the *Miranda* warnings at 9:44 p.m. [*Id.* at 18–19]. Glass stated that she understood her rights and consented to answering questions without a lawyer present. [*Id.*]. The agents took a break shortly after reading the *Miranda* warnings and asked Glass if she wanted anything to eat, which she did. [*Id.* at 21–22]. Agent Meador brought Glass a soda

---

3. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and chips. [*Id.* at 22]. At another point during the interview, Glass asked to use the restroom and was escorted there by a DCPD officer. [*Id.*]. At no time during the interview did Agent Myers or Agent Meador threaten Glass, promise her anything in exchange for continued cooperation, yell at her, or attempt to physically intimidate her. [*Id.* at 23–24]. Glass never asked to speak with an attorney or for the interview to end. [*Id.* at 24–25]. The interview concluded sometime between 11:30 p.m. and midnight, and at its conclusion, Glass was arrested and transferred to the DeKalb County jail. [*Id.* at 15, 42–43].

At the evidentiary hearing on Glass' motion to suppress, her mother, Estelle Glass, testified about Glass' diabetes. [Doc. 104 at 3]. Glass was diagnosed with Type II diabetes when she was ten years old, and has to take insulin shots to control her diabetes. [*Id.*]. From the time that Glass was eighteen years old, her supply of insulin has been irregular because she is no longer covered under her mother's health insurance, and the family has not always been able to afford Glass' insulin. [*Id.* at 4–5]. When Glass is unable to take insulin, she will sometimes have a seizure and have to be hospitalized. [*Id.* at 6]. Insufficient insulin combined with an improper diet will cause Glass to be tired and sleepy. [*Id.* at 10]. Glass' mother testified that the indicators of Glass' seizures were foaming at the mouth and "talking out of her head," by which she meant that Glass would say things and not recall them later or "talk crazy." [*Id.* at 6–7, 16].

Glass' mother testified that for the week prior to December 17, 2008, she had not been able to afford Glass' insulin. [*Id.* at 11–12]. She had no personal knowledge of Glass' blood sugar levels as reported by a meter during this time. [*Id.* at 12]. However, she testified that Glass' behavior on the afternoon and evening of December 17, 2008, was consistent with her behavior when her blood sugar levels are high. [*Id.* at 12–14].

Specifically, Glass' mother testified that around 3:45 p.m. on December 17, 2008, Glass picked her up from work to give her a ride home. [*Id.* at 13, 21]. During the ride, Glass started talking to her mother inappropriately and yelling at her. She testified that Glass was "talking crazy" and "talking out of her head," and that Glass' eyes started swelling and she looked tired. [*Id.* at 13–14]. Her mother got out of the car, went to the store, and then walked the rest of the way home. [*Id.* at 14, 23–24]. Glass' mother learned from her other children that Glass' picture had been shown on the news as a suspect in a bank robbery, and when she arrived home, she saw the news report as well. [*Id.* at 10–11, 23].

Glass' mother called Glass to ask why her picture was on TV and told her to turn herself in. [*Id.* at 11]. Glass replied that she was going to call a friend of hers on the police force. [*Id.* at 15]. Glass' mother did not speak to her anymore that day, although she found out that Glass had car trouble on her way to the police station, and she went to pick her up. [*Id.*]. When she arrived at the location where Glass was supposed to be, Glass had already gotten a ride to the police station. [*Id.*].

Agent Myers testified that she has some familiarity with the symptoms diabetics can experience as a result of low blood sugar because her father is diabetic, and she did not see any of those symptoms in Glass. [Doc. 105 at 15]. Agent Myers testified that, throughout the interview, Glass was coherent, spoke clearly and concisely, and did not exhibit any outward signs of not being able to understand what she was saying. [*Id.* at 16]. Glass did not slur her speech, exhibit glassy or bloodshot eyes, complain of shortness of breath, or state that she felt ill. [*Id.* at 20–21].

## B. Facts Relating to Harris' Motion to Suppress, [Doc. 103]

On December 19, 2008, between 2:00 and 3:00 a.m., Harris and Harrold[4] (collectively "defendants") were arrested in McComb, Mississippi, pursuant to arrest warrants for bank robbery issued in the Northern District of Georgia. [Doc. 109 at 7, 11]. Between 7:00 and 7:30 a.m. on December 19, FBI Special Agent Nathan Songer ("Agent Songer") learned of the arrests. [*Id.* at 11]. Agent Songer is assigned to the FBI Resident Agency in Hattiesburg, Mississippi. [*Id.* at 8]. After receiving the call about the arrests of Harris and Harrold, Agent Songer went to his office and contacted agents in Atlanta about the arrests. [*Id.* at 12].

Harris and Harrold were being held at the Pike County Law Enforcement complex, which is approximately a ninety minute drive from both Hattiesburg and Jackson, Mississippi, where the FBI's main division in Mississippi is located. [*Id.* at 8, 14]. In order to transport the men to an initial appearance in front of a magistrate judge, Agent Songer needed to arrange for a total of four agents to accompany them. [*Id.* at 14]. The Hattiesburg Resident Agency has only two agents assigned to it, including Agent Songer, so Agent Songer needed to arrange for two agents to travel from Jackson to the Pike County Law Enforcement complex in order to escort defendants to their initial appearance. [*Id.* at 8, 14–15].

Agent Songer first called the magistrate judge in Hattiesburg, and he learned that the judge was on leave and, therefore, unavailable. [*Id.* at 13, 15]. Agent Songer then contacted an Assistant United States Attorney ("AUSA") in the United States Attorney's office, who contacted the duty magistrate judge in Jackson. [*Id.* at 15]. The AUSA learned that the duty magis-

trate judge did not have room in the schedule for Harris and Harrold's initial appearances as the court in Jackson does not schedule court appearances after 2:30 p.m. on Fridays. [*Id.* at 15–16]. The initial appearances for Harris and Harold were scheduled for 2:30 p.m. on Monday, December 22, 2008. [*Id.* at 15–16]. The AUSA relayed this information to Agent Songer at approximately 10:30 a.m. [*Id.* at 15]. The agents did not attempt to schedule an earlier initial appearance in front of a state or local judge. [*Id.* at 20].

Agent Songer and another FBI agent, Special Agent Knight, made arrangements to travel to Pike County to interview the defendants. [*Id.* at 16]. The agents arrived at the Pike County Law Enforcement complex around 12:30 p.m., and met with the local detective who was handling the case. [*Id.* at 17]. The agents and local law enforcement then performed a search of defendants' vehicle. [*Id.*]. At approximately 2:30 p.m., the agents began their interviews of the defendants, interviewing Harrold first and then Harris. [*Id.*]. The interview with Harris began at approximately 3:25 p.m. [*Id.*]. Harris had his initial appearance in front of a magistrate judge the following Monday, December 22, 2008 at 2:30 p.m. [*Id.* at 10].

## II. DISCUSSION

### A. Glass' Motion to Suppress, [Docs. 74 & 83]

Glass argues that both her pre-*Miranda* and post-*Miranda* statements must be suppressed. [Doc. 110 at 4–6]. Glass contends that she was in custody from the time that she was placed in the interview room and that her identification of herself in the surveillance photograph prior to receiving her *Miranda* warnings was a violation of her Fifth Amendment rights and is

---

**4.** Harrold has not joined in Harris' motion to suppress.

subject to suppression. [*Id.* at 4–5]. Glass further contends that the post-*Miranda* statements must be suppressed because they were the product of her pre-waiver statement, and her waiver was not knowing, intelligent, and voluntary due to her diabetes-induced high blood sugar. [*Id.* at 5–6]. The Government argues that, under the totality of the circumstances, Glass' waiver of her *Miranda* rights was knowing, intelligent, and voluntary. [Doc. 106 at 6–7]. The Government has not responded to Glass' argument that her pre-*Miranda* waiver statements should be suppressed.[5]

### 1. Pre-*Miranda* Waiver Statements

■■■ Under the Supreme Court's decision in *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602, an individual in police custody must be apprised of his Fifth Amendment rights before being subjected to interrogation. In order for *Miranda* warnings to be required, the individual must be both in custody and subject to interrogation. *Id.* at 477–78, 86 S.Ct. 1602; *see Garcia v. Singletary,* 13 F.3d 1487, 1489 (11th Cir.1994) ("A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.") (*citing Miranda,* 384 U.S. at 444, 86 S.Ct. 1602). Whether an individual is "in custody" for the purposes of *Miranda* is determined by examining

first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set

and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (internal marks, footnote, and citation omitted). Whether an individual was in custody is determined under the totality of the circumstances and is judged by an objective test, i.e., "how a reasonable man in the suspect's position would have understood his situation." *United States v. Phillips,* 812 F.2d 1355, 1360 (11th Cir.1987) (*per curiam* ) (internal marks and citation omitted); *see United States v. Harris,* 613 F.Supp.2d 1290, 1299 (S.D.Ala.2009).

Consistent with these principles, courts have found that an individual was not in custody when he arrived at the police station voluntarily and was not restrained in any way, *Harris,* 613 F.Supp.2d at 1300, *Phillips,* 812 F.2d at 1362, or when the individual went to the police station willingly and had only a short interview with officers, *Peoples v. Campbell,* 377 F.3d 1208, 1213–14 (11th Cir.2004), *Oregon v. Mathiason,* 429 U.S. 492, 493, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). In *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004), the Supreme Court noted that factors weighing against a finding that an individual was in custody include: the individual's voluntary arrival at the police station; lack of a police-imposed requirement to arrive at a certain time; lack of threats or suggestions that the individual would be placed under arrest; and the anticipated short length of

---

**5.** The burden of proof on a motion to suppress evidence rests with the moving party, *see United States v. Garcia,* 132 F.Supp.2d 1338, 1343 n. 10 (M.D.Fla.2000), although the government bears the burden of proving that

a waiver of *Miranda* rights was voluntary, *United States v. Chirinos,* 112 F.3d 1089, 1102 (11th Cir.1997). *See also Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

the interview. However, the Court also identified factors that would weigh in favor of a finding that an individual was in custody, including the lengthiness of the interview and the lack of a statement to the defendant that he was free to leave. *Id.* at 665, 124 S.Ct. 2140.

■ In this case, the following circumstances are relevant to the Court's determination of whether Glass was in custody before she was read her *Miranda* rights: Glass went to the station voluntarily after seeing her photograph on the news; Glass was not told that she was not under arrest or that she was free to leave; Glass was locked in an interview room while waiting for the agents to start the interview; Glass' wallet and her identification were taken from her at some point prior to the interview; Glass was not restrained and the interview room door was unlocked during the interview; and Glass was not told that she was under arrest or could not leave until the conclusion of the interview.

Given these circumstances, a reasonable person would not have felt free to terminate the interrogation and leave. Glass was placed in a locked room for fifteen to forty-five minutes before the interview started and she was without her wallet and identification for this period, it having been taken from her at some point prior to the beginning of the interview. The Eleventh Circuit and other courts have held that when an individual's identification is taken and retained by law enforcement, a reasonable person in that individual's shoes would not feel free to leave. *See United States v. Thompson,* 712 F.2d 1356, 1359 (11th Cir.1983) (finding that an investigative stop at an airport became a seizure when an officer asked defendant to produce an object from his car while the officer retained defendant's driver's license because "[w]ithout his driver's license [defendant] was effectively immobilized"); *United States v. Glover,* 957 F.2d 1004,

1009 (2d Cir.1992) (holding that a seizure occurred when a law enforcement officer asked defendant to go to a private office for questioning, retained defendant's identification, and did not tell defendant he was free to leave). While *Thompson* and *Glover* deal with the concept of "free to leave" within the Fourth Amendment seizure context, not *Miranda,* their analysis is nonetheless relevant to the inquiry here. *See United States v. Newton,* 369 F.3d 659, 672 (2d Cir.2004) ("Because seizure is a necessary prerequisite to *Miranda* ... it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis is required because, as *Berkemer v. McCarty,* [468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)], instructs, not every seizure constitutes custody for purposes of *Miranda.*").

While Glass did arrive at the police station voluntarily and was not formally restrained, she was placed in a locked room for fifteen to forty-five minutes and was without her wallet and identification for this period. *See Harris,* 613 F.Supp.2d at 1300 (suspect was not in custody where he was not restrained *or put into a locked room* ). These intervening circumstances would have made a reasonable person in Glass' shoes feel that she was not free to leave. *See Glover,* 957 F.2d at 1009 (finding that the failure to tell defendant he was free to leave "combined with the failure to return [defendant's] identification and the request to accompany the officers to a police room[ ] amounted to a seizure because under such circumstances, a reasonable person would not have felt free to leave"); *Thompson,* 712 F.2d at 1359 (an

investigative stop at an airport became a seizure when an officer asked defendant to produce an object from his car while the officer retained defendant's driver's license because "[w]ithout his driver's license [defendant] was effectively immobilized").

■ However, the *Miranda* inquiry does not end here. Not feeling free to leave is insufficient to create a custodial situation because "not every seizure constitutes custody for the purposes of *Miranda*." *Newton,* 369 F.3d at 672. The Court "must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.*

In this case, a reasonable person in Glass' shoes would have understood her freedom of movement to be restrained to the degree associated with a formal arrest. Glass arrived at the police station after seeing her photograph on the news in connection with a story about the bank robbery earlier that day. Her wallet and identification were taken from her, and she was placed in a locked room for fifteen to forty-five minutes. Glass was clearly restrained, both by her inability to physically leave the room and by the retention of her wallet and identification. Although courts have held that when an individual goes to the police station voluntarily, he or she is not in custody for the purposes of *Miranda,* the defendants in those cases were also told that they were not under arrest or were not restrained at the police station. *See, e.g., Harris,* 613 F.Supp.2d at 1300 (defendant was not in custody when he arrived voluntarily at police station and was not arrested, handcuffed, or placed in a locked room); *Peoples,* 377 F.3d at 1228 (defendant was not in custody when he went to the police station voluntarily and was told he was not under arrest); *Phillips,* 812 F.2d at 1362 (defendant was not in custody where he drove himself to the

police station in response to a message from an officer and was not restrained or placed under arrest); *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711 ("[T]here is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest.").

Here, in contrast, Glass arrived at the station voluntarily after seeing her photograph broadcast on the evening news in connection with an investigation of a bank robbery, but her wallet and identification were taken from her, and she was placed in a locked room for fifteen to forty-five minutes. According to Agent Myers' testimony, Glass was never told that she was not under arrest or was free to leave. Under the totality of the circumstances, the Court concludes that a reasonable person in Glass' position would have "understood [her] freedom of action to have been curtailed to a degree associated with formal arrest." *Newton,* 369 F.3d at 672. Glass was therefore in custody for the purposes of *Miranda.*

■ In order to suppress a defendant's statement given prior to *Miranda* warnings, the defendant must be both in custody and subject to interrogation. *Miranda,* 384 U.S. at 477–78, 86 S.Ct. 1602; *see Garcia,* 13 F.3d at 1489. Here, the Government does not argue that Glass was not subject to interrogation. "Interrogation[ ] under *Miranda* means any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Lopez–Garcia,* 565 F.3d 1306, 1317 (11th Cir.2009) (internal marks and citation omitted). Here, after showing Glass surveillance photographs of the sus-

pected bank robbers, whom Glass identified, the agents showed her a surveillance photograph of the men's female companion. As Glass had already identified the men and talked about an encounter with them earlier in the day, showing Glass a photograph of their female companion was likely to elicit an incriminating response from her. *See United States v. Poole,* 794 F.2d 462, 466–67 (9th Cir.1986) (showing the defendant surveillance photographs from a robbery and asking questions about them constituted interrogation). Glass was therefore subject to interrogation. Because Glass was subjected to custodial interrogation before she was advised of her *Miranda* rights, the undersigned **RECOMMENDS** that Glass' motion to suppress her pre-*Miranda* statements be **GRANTED.**

## 2. Post-*Miranda* Waiver Statements

Glass contends that her post-*Miranda* waiver statements must also be suppressed because they were the product of a statement obtained in violation of Glass' Fifth Amendment rights and her waiver was not knowing, voluntary, and intelligent. [Doc. 110 at 5–6]. The Government argues that Glass' waiver was knowing, voluntary, and intelligent, but does not address whether Glass' post-*Miranda* statements should be suppressed as the product of Glass' suppressed, pre-*Miranda* statement.

### a. Suppression of post-*Miranda* statements

 Glass argues that her post-*Miranda* statements must be suppressed because they were the fruit of the initial, suppressed admission. [Doc. 110 at 5–6]. However, when a defendant makes a pre-*Miranda* statement that is subject to suppression, subsequent statements made after the defendant has waived his *Miranda* rights are admissible as long as they are voluntary. *See Oregon v. Elstad,* 470 U.S.

298, 317–18, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). As the Supreme Court explained in *Elstad,* procedural violations of *Miranda* "differ[ ] in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine." *Id.* at 306, 105 S.Ct. 1285. While Fourth Amendment violations generally result in application of the exclusionary rule, statements obtained in violation of *Miranda* can still be used in limited circumstances, such as for impeachment purposes on cross-examination. *Id.* at 306–07, 105 S.Ct. 1285.

In *Elstad,* officers went to speak with the defendant, a teenage robbery suspect, at his home. *Id.* at 300, 105 S.Ct. 1285. The defendant made some incriminating statements to the officers, and was subsequently taken to the police station, where he gave a written confession after having been read his *Miranda* rights. *Id.* at 300–02, 105 S.Ct. 1285. The initial statements were suppressed because they were obtained in violation of *Miranda,* but the Supreme Court held that the defendant's written statement was admissible because it was given after a voluntary waiver of defendant's *Miranda* rights. As the Court stated,

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309, 105 S.Ct. 1285. Because both the suppressed statement and the written confession were given voluntarily, the Supreme Court held that the defendant's post-*Miranda* waiver statement was admissible. *Id.* at 314–17, 105 S.Ct. 1285; *see id.* at 318, 105 S.Ct. 1285 ("[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made.") (footnote omitted).

The Supreme Court refined *Elstad*'s holding in *Missouri v. Seibert*, 542 U.S. 600, 617, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), finding that a second, post-*Miranda* confession is not admissible when it is the product of deliberate withholding of *Miranda* warnings by police officers.[6] In *Seibert*, officers interviewed the defendant and got her to make incriminating statements before she was read her *Miranda* rights. *Id.* at 604–05, 124 S.Ct. 2601. The officers then read the defendant the *Miranda* warnings and used her prior statements to elicit post-*Miranda* waiver confessions. *Id.* at 605–06, 124 S.Ct. 2601. The Supreme Court found that the post-*Miranda* waiver statements were subject to suppression as products of the initial statements because the initial statements were used to leverage the post-*Miranda* waiver confession and the defendant did not know that her initial statements could not be used against her. *Id.* at 616, 621–22, 124 S.Ct. 2601. As Justice Kennedy

stated, "[w]hen an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id.* at 621, 124 S.Ct. 2601. However, Justice Kennedy also explained that "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." *Id.* at 622, 124 S.Ct. 2601. Thus, absent deliberate withholding of *Miranda* warnings, *Elstad* continues to control the admissibility of post-*Miranda* warning statements when an initial statement was given in violation of *Miranda*. *Street*, 472 F.3d at 1313–14; *Naranjo*, 426 F.3d at 232.

 In this case, there is no indication that the agents deliberately withheld reading of the *Miranda* warnings while attempting to elicit incriminating statements from Glass. As soon as Glass identified herself in the surveillance photographs, the agents read her the *Miranda* warnings. [Doc. 105 at 12–13]. The interview then proceeded for approximately two hours, during which the agents obtained additional information from Glass. [*Id.* at 25, 42–43]. When the subject matter of the pre-*Miranda* and post-*Miranda* statements differs, it is less likely that the officers were using the deliberate interrogation tactics that invoke *Seibert*. *See United States v. Stewart*, 536 F.3d 714, 722

---

6. The Court's decision in *Seibert* was a plurality opinion. *See* 542 U.S. at 600, 124 S.Ct. 2601. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds...." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)

(internal marks and citation omitted). The Eleventh Circuit, along with most other Circuits, has concluded that Justice Kennedy's concurrence represents *Seibert*'s holding. *See United States v. Street*, 472 F.3d 1298, 1313–14 (11th Cir.2006); *United States v. Naranjo*, 426 F.3d 221, 231–32 (3d Cir.2005); *United States v. Hernandez*, 200 Fed.Appx. 283, 286 n. 1 (5th Cir.2006) (unpublished) (collecting cases).

(7th Cir.2008) ("[T]he lack of overlap between the warned and unwarned statements is evidence that the interrogator did not deliberately use a two-step strategy designed to circumvent *Miranda.*"); *Street,* 472 F.3d at 1314 (agent's questioning was not an attempt to circumvent *Miranda* in part because he "did not withhold *Miranda* warnings, solicit a full confession, and then lead [defendant] back through his confession again"). Because there is no evidence here that the agents were employing a deliberate tactic to deprive Glass of her protections against self-incrimination, *Elstad* will apply. *See Hernandez,* 200 Fed.Appx. at 287 (holding that, because there was no evidence that the officers "were pursing any kind of deliberate strategy that would require suppression of the statement under *Seibert,*" *Elstad* applied to the case) (internal marks omitted); *Street,* 472 F.3d at 1314 (holding that *Elstad* applied because the agent did not use interrogation techniques designed to undermine the *Miranda* warnings).

As a result, Glass' post-*Miranda* statements will be admissible if both they and her initial statement were voluntary. *See Elstad,* 470 U.S. at 318, 105 S.Ct. 1285 ("[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made.") (footnote omitted). A statement given in violation of *Miranda* will still be voluntary if the police did not violate the defendant's Fifth Amendment rights. *Martin v. Wainwright,* 770 F.2d 918, 928 (11th Cir.1985) *modified on other grounds on denial of reh'g,* 781 F.2d 185 (11th Cir. 1986). In assessing whether a confession was voluntary, the court must determine whether the defendant " 'made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.' " *Id.* at 924 (*quoting Jurek v. Estelle,* 623 F.2d 929, 937 (5th Cir.1980) [7]).

In this case, there is no evidence that Glass' pre-*Miranda* statements to the agents were not voluntary. Glass arrived at the police station voluntarily and wanted to speak with the agents. Agent Myers testified that neither she nor Agent Meador threatened or coerced Glass, or promised her anything in exchange for her cooperation. The Eleventh Circuit has found statements to be voluntary in the presence of more coercive circumstances than exist in this case. *See, e.g., Martin,* 770 F.2d at 925 (confession was voluntary even though officers "misrepresented the strength of the state's case against [defendant] ... promised that an attempt would be made to obtain psychiatric help for him, told him that the truth 'couldn't hurt him,' ... gave him legal advice concerning the possible effect of a confession ... [and failed] to honor his request to 'wait until tomorrow' "); *see also Johnson v. Jones,* Civil Action 88–1046–CB–S, 1992 U.S. Dist. LEXIS 2837, at *23–24 (S.D.Ala. Jan. 29, 1992) (finding defendant's statements were made voluntarily when there was no evidence of coercion or improper inducements by the officer). Accordingly, the undersigned concludes that Glass' pre-*Miranda* statements to the agents were voluntary.

Glass' post-*Miranda* statements will therefore be admissible if they were also voluntary. As noted above, there is no evidence that the agents employed any coercion, threats, or improper inducements

---

7. Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. *Bonner v. City of* *Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

at any time during the interview. Glass never asked to end the interview or to speak with an attorney. In addition, "[t]he fact that a suspect chooses to speak after being informed of [her] rights is, of course, highly probative." *Elstad,* 470 U.S. at 318, 105 S.Ct. 1285. As discussed below, Glass was read her *Miranda* rights, waived them, and continued speaking with the agents. Given these circumstances, the undersigned concludes that Glass' post-*Miranda* statements were voluntary. However, they may nonetheless be subject to suppression if Glass' waiver of her *Miranda* rights was not knowing, intelligent, and voluntary, which the Court will next address.

### b. Glass' waiver of her *Miranda* rights

The government bears the burden of proving by a preponderance of evidence that Glass validly waived her *Miranda* rights. *Chirinos,* 112 F.3d at 1102. *See also Connelly,* 479 U.S. at 168–69, 107 S.Ct. 515. In *Miranda,* the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467, 86 S.Ct. 1602. Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, *Miranda* established certain procedures officers must follow. Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present ... if [he] so desires." *Id.* at 468–70, 86 S.Ct. 1602.[8] *Miranda* further requires that law en-

forcement respect the suspect's decision to exercise his rights as outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. 1602. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. 1602.

 A defendant may waive his rights if the waiver is made voluntarily, knowingly, and intelligently. *Id.* at 444, 86 S.Ct. 1602. This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*United States v. Patterson,* No. 1:06–CR–500–1–TWT, 2007 WL 2331080, at *3 (N.D.Ga. Aug. 10, 2007), adopted at *1 (*quoting United States v. Barbour,* 70 F.3d 580, 585 (11th Cir.1995)). *See also Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Fare v. Michael C,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The voluntariness

---

**8.** There is no dispute that the agents provided Glass adequate *Miranda* warnings after she

identified herself in the surveillance photograph.

analysis often depends on whether "the defendant's will was overborne." *Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). Thus, to find a waiver involuntary, "coercive police activity is a necessary predicate." *Connelly,* 479 U.S. at 167, 107 S.Ct. 515. *See also Moran,* 475 U.S. at 421, 106 S.Ct. 1135 ("[T]he relinquishment of the [*Miranda*] right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."). Therefore, "in the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary." *United States v. Minard,* 208 Fed.Appx. 657, 660 (10th Cir.2006) (unpublished).

■ "A valid waiver, however, requires more than just a finding of voluntariness. In addition to being voluntary, a waiver of *Miranda* rights must also be knowing and intelligent." *Id.* In contrast to a finding of voluntariness, the court "need not find coercion in order to find a defendant's waiver unknowing or unintelligent." *Id.* (citation omitted). "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." *Patterson,* 2007 WL 2331080, at *3. "[T]he totality of the circumstances must demonstrate a defendant waived his rights with a 'requisite level of comprehension.'" *Minard,* 208 Fed.Appx. at 660 (*quoting Moran,* 475 U.S. at 421, 106 S.Ct. 1135). However, an express oral or written waiver of *Miranda* is strong proof of the validity of the waiver. *United States v. Stephens,* 202 F.Supp.2d 1361, 1370 (N.D.Ga.2002). *See also North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

As indicated earlier, "'[a] waiver is knowing and intelligent only if it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Wattree,* 544 F.Supp.2d 1262, 1274 (D.Kan.2008) (*quoting Minard,* 208 Fed.Appx. at 660) (internal marks omitted). Thus, "'[a] defendant need not ... understand all the consequences of the waiver. He need only understand his right to remain silent or have his statements used against him.'" *Id.* at 1274–75. Whether a suspect intelligently waived his rights depends on the particular circumstances in a case, including the background, experience, and conduct of the accused. *Edwards,* 451 U.S. at 482, 101 S.Ct. 1880.

Here, Agent Myers testified that neither she nor Agent Meador threatened Glass, promised her anything in exchange for information, physically intimidated or yelled at her, or told her she would not be charged if she kept talking to the agents. [Doc. 105 at 23–25]. Glass does not argue that her *Miranda* waiver was the product of police coercion, *see* [Doc. 110], and based on Agent Myers' testimony, the undersigned concludes that Glass' waiver was free of coercion and was therefore voluntary.

However, Glass does argue that her waiver was not knowing and intelligent because she was suffering from high blood sugar as a result of her diabetes during the interview. [Doc. 110 at 6]. The Government argues that the circumstances surrounding the waiver, specifically, Glass' calm demeanor and lack of a request to stop, indicate that the waiver was knowing and intelligent. [Doc. 106 at 7–8].

■ Whether a defendant validly waived his or her Miranda rights is determined by examining the totality of the circumstances. *Minard,* 208 Fed.Appx. at 660 ("[T]he totality of the circumstances must demonstrate a defendant waived his

rights with a requisite level of comprehension.") (internal marks omitted). Here, when asked whether she was under the influence of any drugs, Glass stated that she was diabetic. When the agents asked if Glass needed to take a break or needed any food, Glass replied that she was fine. [Doc. 105 at 15]. As Agent Myers read Glass her *Miranda* rights, Glass read along from the written advice-of-rights form. [*Id.* at 18–20]. Glass did not ask Agent Myers to repeat anything or ask any questions, or give any indication that she did not understand what was being read. [*Id.* at 20]. Glass signed the *Miranda* waiver form, which was admitted into evidence at the evidentiary hearing. [Gov. Ex. 1]. At no point during the interview did Glass ask to end the interview or to speak with an attorney. [Doc. 105 at 25]. However, Glass' mother testified that Glass was exhibiting symptoms of high blood sugar earlier in the day, specifically, that Glass' eyes were swelling and she was "talking out of her head."

■ When an individual informs law enforcement officers that he is experiencing symptoms of insulin shock, a waiver of *Miranda* rights executed shortly thereafter cannot be knowing and intelligent. *United States v. Watson,* 469 F.2d 362, 365–67 (5th Cir.1972); *cf. United States v. Galvan–Mena,* No. 08–CR–30019–MJR, 2008 WL 5423576, at *4 (S.D.Ill. Dec. 29, 2008) (waiver of *Miranda* rights valid even though defendant claimed to be suffering from diabetes-related illness because officers testified that defendant appeared coherent at all times and "at no time did [defendant] indicate that he was diabetic, that he was not feeling well, or that he needed to eat, take medication, or see a doctor"). In *Watson,* the defendant was in police custody and had been taken to the hospital for an insulin shot after he informed officers that he was going into hyperglycemic shock. *Id.* at 365. Shortly after his return to jail from the hospital, two FBI agents arrived to interview Watson. *Id.* As the agents began to read Watson his *Miranda* rights, Watson informed them that he was going into insulin shock and requested a soda. *Id.* The agents obliged, and then finished reading Watson his rights and obtained a waiver of those rights. *Id.* On appeal, the Fifth Circuit determined that Watson's waiver could not have been knowing and intelligent because "no one really disputes that immediately prior to the warning and waiver in this case the appellant was indeed under at least some sort of medically connected disorientation." *Id.* at 367.

Here, the only evidence suggesting that Glass was experiencing high blood sugar and was therefore impaired is the testimony of her mother, Estelle Glass, who last saw her daughter on December 17, 2008, at approximately 4:00 p.m. Agent Myers, who first spoke with Glass on December 17 at approximately 9:15 p.m., testified that Glass did not appear to be ill and did not request any medical attention. Although Glass did inform the agents that she had diabetes, unlike in *Watson,* she did not state that she was suffering from high blood sugar or was otherwise impaired as a result of her diabetes. In addition, Glass signed a written waiver, which is strong proof of the validity of the waiver. *See Stephens,* 202 F.Supp.2d at 1370. Accordingly, the Government has met its burden of proving that Glass' waiver of her *Miranda* rights was voluntary, knowing, and intelligent. *See Galvan–Mena,* 2008 WL 5423576, at *4 (waiver of *Miranda* rights valid even though defendant claimed to be suffering from diabetes-related illness because officers testified that defendant appeared coherent at all times and "at no time did [defendant] indicate that he was diabetic, that he was not feeling well, or that he need to eat, take medication, or see a doctor"). Accordingly, the undersigned **RECOMMENDS** that Glass' motion to

suppress her post-*Miranda* statements be **DENIED.**

## B. Harris' Motion to Suppress, [Doc. 103]

Harris argues that the statements made during his interview with Agents Songer and Knight should be suppressed because the agents failed to comply with the prompt presentment requirement of Rule 5 of the Federal Rules of Criminal Procedure. [Doc. 118]. The Government argues that there was no unreasonable delay in presenting Harris to a magistrate judge, and the statements should therefore not be suppressed. [Doc. 113 at 5 *et seq.*].

Federal Rule of Criminal Procedure 5 states that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." Fed.R.Crim.P. 5(a)(1)(A). Any statements obtained from a defendant before he has had an initial appearance before a magistrate judge are subject to suppression if there was an unnecessary delay in conveying the defendant to the magistrate judge. *See Corley v. United States*, — U.S. —, 129 S.Ct. 1558, 1563, 173 L.Ed.2d 443 (2009) (discussing the presentment exclusionary rule established in *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957)). Under 18 U.S.C. § 3501(c), any admissions made within six hours of arrest are deemed admissible as long as they were made voluntarily and are otherwise admissible under the Federal Rules of Evidence. *Corley*, 129 S.Ct. at 1571. A confession that is obtained outside of the six hour window can still be admissible if the "longer delay was 'reasonable considering the means of transportation and the distance to be trav-

eled to the nearest available [magistrate] [.]' ". *Id.* (*quoting* 18 U.S.C. § 3501(c) (alterations in original)). "If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the confession is to be suppressed." *Id.*

When determining whether a violation of Rule 5 has occurred, courts consider the reasons for the delay, *United States v. Purvis*, 768 F.2d 1237, 1239 (11th Cir.1985), including factors such as "the availability of a committing magistrate, the length of the delay before the prisoner is taken before the magistrate, and the police purpose or justification, if any, for the delay." *United States v. Mendoza*, 473 F.2d 697, 702 (5th Cir.1973) (citation and internal marks omitted). A "delay for the purpose of interrogation is the epitome of 'unnecessary delay.'" *Corley*, 129 S.Ct. at 1563 (citations omitted). Some courts have required the defendant to show a causal connection between the delay and the confession in order to establish a violation of Rule 5. *See United States v. Mullin*, 178 F.3d 334, 342 (5th Cir.1999) ("Where there is no evidence to support a finding that the delay was for the purpose of obtaining a confession, there is no evidence that the delay had a coercive effect on the confession, there is no causal connection between the delay and the confession, and the confession was otherwise voluntarily given ... the defendant has not shown prejudice by the delay.") (internal marks and citation omitted); *United States v. Gaines*, 555 F.2d 618, 622 (7th Cir.1977) ("Impliedly, at the very least, we have required a defendant to establish that a delay was deliberately induced for the express purpose of producing evidence.") (internal marks and citation omitted).

■ "[A]dministrative delays due to the unavailability of government personnel and judges necessary to completing the arraignment process are reasonable and necessary and therefore do not violate the prompt-presentment requirement of Rule 5(a)." *United States v. Garcia–Hernandez,* 569 F.3d 1100, 1106 (9th Cir.2009). Moreover, an overnight or weekend delay due to the unavailability of a magistrate judge is not unreasonable. *United States v. Van Poyck,* 77 F.3d 285, 289 (9th Cir. 1996) ("An overnight or weekend delay in arraignment due to the unavailability of a magistrate does not by itself render the delay unreasonable under § 3501(c)."); *see United States v. Burgard,* 551 F.2d 190, 194 (8th Cir.1977) (twenty-four hour delay in presenting defendant to magistrate was not unreasonable because although magistrate was out of town for a short period, that did not render the magistrate unavailable).

In this case, the interview of Harris began at approximately 3:25 p.m., more than twelve hours after his arrest. Therefore, the interview does not fall within the six hour window established in § 3501(c), and Harris' statements will only be admissible if the delay in presentment was neither unreasonable nor unnecessary. *Corley,* 129 S.Ct. at 1571. Agent Songer began his attempts to find an available magistrate judge shortly after learning of Harris' arrest. Agent Songer first contacted the magistrate judge in Hattiesburg, but learned that the judge was on leave that day and, therefore, unavailable. Agent Songer next contacted the AUSA in Jackson to inquire about the availability of the duty magistrate judge there, and learned that the judge in Jackson would not accept initial appearances after 2:30 pm and did not have room in the schedule for defendants' initial appearances. An initial appearance was then scheduled on the following Monday. Agent Songer did not travel to the Pike

County Law Enforcement complex to interview Harris and Harrold until exhausting his efforts to schedule their initial appearance before a magistrate judge on Friday. Under these circumstances, the Court finds that Agent Songer was not attempting to delay presentment in order to obtain a confession; to the contrary, Agent Songer's first actions involved trying to find an available magistrate judge.

Harris argues that the delay was unreasonable because Agent Songer could have departed for Pike County sooner, picked up Harris, and driven to Jackson in time to make an initial appearance before 2:30 p.m. [Doc. 118 at 6–7]. However, Agent Songer was informed that the magistrate judge in Jackson did not have room in the schedule for defendants' initial appearances on Friday. Moreover, as Agent Myers testified, two agents were required to accompany individuals in custody, and Harris was in custody along with Harrold. In order to arrange an initial appearance for both men, four agents were needed, and only two were located in Hattiesburg. Given the travel time required for additional agents from Jackson, and the time required to take Harris and Harrold into custody and transport them to Jackson, the delay until Monday was not unreasonable. *See United States v. McKinley,* 228 F.Supp.2d 1158, 1167 (D.Or.2002) (delay in initial appearance from Friday to Monday was reasonable when transporting the defendant to an available magistrate would have required two agents to drop their investigative work and travel approximately two hours with no guarantee that they would have arrived in time to make the calendar).

Harris also argues that Agent Songer should have attempted to schedule an initial appearance before a state or local judicial officer, and that his failure to do so violates Rule 5. [Doc. 118]. Rule 5(c)(1)

provides that the initial appearance for a defendant arrested in the district where the offense was allegedly committed may be before a state or local judicial officer if a magistrate judge is not reasonably available, but no similar provision is found in subsection (c)(2), which applies when the defendant is arrested in a district other than where the offense was allegedly committed. Under Rule 5(c)(2), "the defendant must be taken to a magistrate judge within the district of arrest, unless the appearance can take place more promptly in an adjacent district." Fed.R.Crim.P. 5, advisory committee's note, 2002 amend. Since Harris was arrested in Mississippi for an offense allegedly committed in Georgia, Rule 5 made no provision for presenting him to a state or local judicial officer if a magistrate judge was not reasonably available, and even if it did, the evidence did not show that a magistrate judge was not reasonably available. A magistrate judge was available on Monday, and Agent Songer was under no obligation to secure an initial appearance over the weekend. *See Van Poyck*, 77 F.3d at 290. Given that Agent Songer was not required to locate a magistrate judge over the weekend, the delay until Monday afternoon was not so long as to render the magistrate judge in Jackson unavailable. *See Burgard*, 551 F.2d at 194 (twenty-four hour delay in presenting defendant to magistrate was not unreasonable because although magistrate was out of town for a short period, that did not render the magistrate unavailable).

Harris further argues that his case is analogous to the cases of *United States v. Mansoori*, 304 F.3d 635 (7th Cir.2002), and *United States v. Perez*, 733 F.2d 1026 (2d Cir.1984), in which the courts found a violation of Rule 5. [Doc. 118 at 7–12]. However, neither case is binding on this Court, and both are distinguishable from the case at bar. In *Perez*, the defendant was arrested and taken to the Drug Enforcement Agency ("DEA") headquarters, where he was processed and then placed in a holding cell at approximately 4:45 p.m. 733 F.2d at 1027–28. The DEA agents continued to work the case and one agent even appeared before a magistrate to obtain a search warrant. *Id.* at 1028. At 10:00 p.m., the agents transported defendant to the AUSA's office, which was located in the same building as the magistrate judges. *Id.* at 1028, 1036. However, no magistrates were available for defendant's arraignment at that hour, and the decision was made to interview the defendant. *Id.* at 1028. The defendant had his arraignment the next morning at 9:00 a.m. *Id.* The court found that the defendant's statements were subject to suppression because a magistrate was available until at least 6:25 p.m., and an agent had obtained a search warrant from the magistrate but had not brought along the defendant for an arraignment. *Id.* at 1035–36.

In this case, unlike *Perez*, a magistrate judge was not immediately available for Harris' initial appearance. The magistrate judge in Hattiesburg was on leave, and the magistrate judge in Jackson did not have availability in the schedule for the defendants' initial appearance on Friday, and, in any event, it would have required obtaining additional agents from the Jackson office, taking custody of both Harris and Harrold, and traveling to Jackson with the hopes of arriving before 2:30 p.m. The additional logistical challenges present in this case make it distinguishable from *Perez*. *See McKinley*, 228 F.Supp.2d. at 1167 (agents' decision to delay the initial appearance until Monday was reasonable when the travel time made it uncertain that the defendant and agents would have arrived in time to make the calendar on Friday).

*Mansoori* is similarly distinguishable. In that case, a co-defendant was arrested

by Chicago police at 10:00 p.m. on a Saturday night and turned over to federal authorities at 7:00 a.m. on Monday morning. *Mansoori*, 304 F.3d at 659. An arraignment was scheduled for 1:30 p.m. on Monday. *Id.* at 659–60. Knowing of the appearance, an FBI agent chose to interview the co-defendant at 8:30 a.m., almost thirty-six hours after his arrest. *Id.* at 660, 662. The court ruled that the co-defendant's statements were subject to suppression because the decision to proceed with an interview just five hours before a scheduled arraignment was objectively unreasonable. *Id.* at 662.

Here, Agent Songer did interview Harris knowing that an initial appearance had been scheduled for Monday. However, the interview took place approximately twelve hours after Harris' arrest, not almost thirty-six hours after the arrest as in *Mansoori*. In addition, the *Mansoori* court noted that "in the absence of a more developed record as to the circumstances surrounding [the] decision [to interview the defendant], it gives rise to an impression that the government was attempting to take advantage of the delay in arraigning Cox." *Id.* Here, to the contrary, Agent Songer's first actions after learning of the arrests included attempts to arrange initial appearances for both men, and only after learning that neither the Hattiesburg nor Jackson magistrate judge was able to hold an initial appearance hearing on Friday did Agent Songer go to interview defendants. Additionally, in *Mansoori*, the court noted that the interview was just five hours before the defendant's initial appearance and there were no exigent circumstances to explain why the agent could not have waited until after the arraignment. *Id.* In contrast, the interview here was just two days after the latest bank robbery and almost forty-eight hours before defendants' initial appearance. *Mansoori* is therefore distinguishable from the case at bar.

In short, Agent Songer attempted to schedule an initial appearance for Harris on Friday but was unable to find an immediately available magistrate judge, and logistical considerations regarding the number of defendants, the agents required to transport them, and the distance to travel made the decision to wait until Monday for an initial appearance reasonable. *See McKinley*, 228 F.Supp.2d. at 1167. Agent Songer was not required to secure an initial appearance over the weekend, and he was not required to present Harris to a state or local judge. *See Burgard*, 551 F.2d at 194; *Van Poyck*, 77 F.3d at 290.

Finally, there is no evidence that the delay was orchestrated for the purpose of interrogation. To the contrary, Agent Songer's efforts on Friday morning to attempt to schedule an initial appearance that day indicate that he attempted to promptly present defendants to a magistrate judge. Without any evidence indicating a causal connection between the delay and the interrogation, and in light of the other circumstances, the undersigned concludes that the delay in presentment was reasonable and not unnecessary. *See Mullin*, 178 F.3d at 342; *Gaines*, 555 F.2d at 622 ("Impliedly, at the very least, we have required a defendant to establish that a delay was deliberately induced for the express purpose of producing evidence.") (internal marks and citation omitted). Accordingly, the undersigned **RECOMMENDS** that Harris' motion to suppress, [Doc. 103], be **DENIED.**

### III. *CONCLUSION*

For the foregoing reasons and cited authority, the undersigned Magistrate Judge **RECOMMENDS** that Glass' motion to suppress statements, [Docs. 74 & 83], be **GRANTED IN PART** and **DENIED IN PART,** and that Harris' motion to suppress statements, [Doc. 103], be **DENIED.**

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 3rd day of November, 2009.