# IN THE SUPREME COURT OF IOWA

No. 13–0346

Filed June 10, 2016

**STATE OF IOWA,**

Appellee,

vs.

**ZYRIAH HENRY FLOYD SCHLITTER,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Marsha M. Beckelman, Judge.

Defendant seeks further review of a court of appeals decision affirming convictions for child endangerment resulting in death and involuntary manslaughter by commission of public offense. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Mark C. Smith, State Appellate Defender, Shellie L. Knipfer, Assistant Appellate Defender, and Zyriah Schlitter, pro se, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, Jerry Vander Sanden, County Attorney, and Nicholas Maybanks and Lisa Epp, Assistant County Attorneys, for appellee.

**CADY, Chief Justice.**

In this appeal from convictions of involuntary manslaughter by commission of public offense and child endangerment resulting in death, we primarily consider a claim of ineffective assistance of trial counsel based on the failure to challenge the sufficiency of evidence to support the submission of all four alternative means of committing the crime of child endangerment. On our review, we conclude trial counsel was ineffective, and a new trial must be granted. We affirm the decision of the court of appeals in part and vacate in part, reverse the judgment and sentence of the district court, and remand the case for a new trial.

## I. Background Facts and Proceedings.

Zyriah Schlitter met Nicole King in 2006 and they entered into a relationship. They began sharing a residence and eventually had a daughter, K.S., on September 23, 2008. The relationship ended in late 2009. In February 2010, Schlitter and King agreed that Schlitter would be the temporary primary custodian of K.S. Schlitter was living with his grandparents at the time. He was also dating a woman named Amy Parmer. Schlitter would often stay overnight at Parmer's apartment. Parmer had two children.

On March 1, 2010, Schlitter took K.S. to a medical clinic for a health checkup required for admission to a day-care center. A clinic nurse updated K.S.'s vaccines and found her to be in good health.

K.S. was accepted by the day-care facility on March 2 and attended day care for the remainder of the workweek. Schlitter and K.S. then stayed with Parmer and her children at her apartment over the weekend. Parmer cared for K.S. on Sunday evening while Schlitter attended a financial management class at church for a couple of hours.

On Monday morning, March 8, Schlitter dropped K.S. off at the day-care center. Later that morning, a day-care worker observed a bruise on K.S.'s forehead and around one eye. She also saw marks on the side of K.S.'s chin and discovered makeup had been applied to cover up the bruises. Parmer stopped by the day-care center during the afternoon to check on K.S. and was asked about the injuries. Parmer said K.S. bruised her eye from a fall and was accidentally struck on the forehead by a Pack'n Play® falling out of a closet.

Schlitter did not take K.S. to the day-care center on March 9. K.S. had a fever, and Schlitter took her to the medical clinic. He told a nurse that K.S. had not been sleeping well and had little appetite. The nurse inquired about the bruise on her forehead. Schlitter responded that K.S. fell into a coffee table. K.S. was diagnosed with conjunctivitis and prescribed Motrin® and eyedrops.

Over the next few days, Schlitter's father and grandparents provided day care for K.S. K.S. would cling to Schlitter when he was present. On March 10, K.S. had a fever of 104°. Schlitter called the clinic to report the fever. He was told to continue the Motrin® and eyedrops and to call the next day if there was no improvement. On March 11, Schlitter called the clinic to report that K.S. vomited. He also reported the Motrin® would only briefly keep her fever under control, and an appointment was scheduled for the next day. Schlitter took K.S. to the clinic on March 12. Medical providers diagnosed K.S. with an ear infection and prescribed an antibiotic. No new bruising was observed. On March 13, her temperature returned to normal.

Schlitter and K.S. again stayed at Parmer's apartment on the weekend. King exercised visitation with K.S. for a period of time. She did not notice any bruises on her face or body.

Schlitter dropped K.S. off at the day-care center on Monday, March 15. Workers at the center again observed bruising on her forehead and face. K.S. acted listless and sad. She slept more than normal, did not play, and did not want to interact. When Schlitter was asked about the new facial bruises, he responded that K.S. liked to beat on herself. Workers at the day-care center reported their observations to the Iowa Department of Human Services (DHS). An investigator for the DHS met with Schlitter on March 16. Schlitter admitted to spanking K.S. and told the investigator that K.S. listened better to Parmer. K.S. was not removed from Schlitter's care.

On March 17, K.S. spent the day with King. K.S. was detached and often cried. Schlitter called the medical clinic on March 18 to report that K.S. was very sleepy. The next day, her condition seemed to improve.

Schlitter and K.S. again spent the weekend with Parmer. On Sunday, March 21, K.S. was sleepy, and she often cried. She also clung to Schlitter. At 5:15 p.m., Schlitter left K.S. in the care of Parmer so he could attend the Sunday evening financial management class.

At 7:45 p.m., Parmer called 911 and reported that K.S. was barely breathing. An ambulance arrived at the apartment and transported K.S. to a hospital in Cedar Rapids. Medical personnel at the hospital found her in a decorticate posture. Her pupils were fixed and dilated. The doctor observed hemorrhages in her eyes. She exhibited limited reaction to pain stimuli. After the doctors told Schlitter that her injuries were likely the result of child abuse, he entered the room where K.S. was being treated and told her "I'm sorry."

K.S. was promptly airlifted to the University of Iowa Hospitals & Clinics. Family members gathered to be with her and tension surfaced

between King and Schlitter. King blamed Parmer for the injuries, and Schlitter blamed the day care.

Medical tests and scans of K.S.'s brain showed significant swelling. Despite extensive medical efforts, K.S.'s condition continued to deteriorate. She remained in a coma, which doctors believed would likely never change. K.S. was kept alive by a ventilator and a feeding tube. On Sunday, March 28, King and Schlitter agreed to the removal of life support systems. K.S. died.

On July 11, 2011, the State charged Schlitter and Parmer with murder in the first degree and child endangerment resulting in death. The trials were severed, and Schlitter went to trial on December 3, 2012.

The medical testimony at trial described the injuries to K.S. as nonaccidental or abusive trauma. The medical professionals generally agreed that K.S. had suffered multiple head trauma events. The testimony came from the emergency room doctors and nurses at both hospitals, as well as neurologists, pathologists, an ophthalmologist, radiologist, doctors in the pediatric intensive care unit, and the head of the child protection team.

The external injuries included bruises on K.S.'s cheeks and under her chin; scrapes or red marks on her left shoulder, the nape of her neck, her left ear and cheek, upper right portion of her chest, and her right underarm area; contusions on her right upper arm and left and right inner thighs; and an infected lesion on her left labia. K.S.'s internal injuries included subdural hematomas in the brain and around the spinal cord, as well as other brain injuries. An MRI revealed that K.S. suffered a massive stroke on the left side of her brain, but revealed no evidence that K.S.'s injuries were caused by strangulation.

Multiple doctors testified that the bruises on K.S.'s face and body were different colors, indicating they had occurred at different times. The retinal hemorrhages, brain blood clots, and subdural membranes indicated injuries that could be up to a few weeks old. The blood found in her brain showed signs of fresh bleeding, older bleeding that had happened over two days before the recent injury, and a recent bleeding within hours of K.S. becoming symptomatic. Moreover, with repeated injuries to the same part of the brain, some of the new injury clouded evidence of the older injury.

The time frames suggested by the different doctors' testimonies sometimes conflicted. The estimates ranged from minutes to hours, within a day, a twelve- to twenty-four-hour period estimate, and an "hours to days" time frame. One doctor stated she could not accurately estimate the timing, but that she had not seen any child awake with the kinds of injuries found in K.S. Almost all the medical professionals were clear that a specific time of the injuring event could not be pinpointed due to individual-specific rates of healing, the age of the patient, an unknown rate of bleeding, and uncertainty concerning the number and frequency of injuries.

Dr. Resmiye Oral, the head of the child protection team, specializes in treating and consulting in cases of child abuse. She met with a statewide multidisciplinary team made up of the physicians, law enforcement, DHS employees, and medical examiners involved in K.S.'s case. Dr. Oral collected all of the reports of the physicians and examiners to make a final medical determination regarding K.S.'s injuries. Dr. Oral concluded that K.S. suffered at least two separate episodes of injury. She pinpointed the first injury as likely occurring one or two weeks before K.S. entered the hospital, and the second injury as

inflicted from minutes up to six hours before K.S. was brought to the hospital, noting the shorter time frame was more likely than the longer. The doctor stated it must have been an acute and forceful trauma to explain the injuries found.

The paramedic who responded to the 911 call on March 21 testified to statements made by Parmer in response to questioning about the condition of K.S. Parmer said she found K.S. unresponsive and struggling to breathe. She told a paramedic K.S. had a fever earlier in the week, but was unaware of any falls or injuries.

Law enforcement investigators conducted several interviews with Schlitter and Parmer. Schlitter gave one interview at an Iowa State Patrol Office on March 30, 2010. During the interview, Schlitter acknowledged he was rough on K.S. at times in his discipline of her and was probably incriminating himself by maintaining that Parmer was a good caretaker and would not have harmed K.S. On another occasion, Schlitter told one investigator that while at the hospital, he had researched head trauma symptoms and that K.S. had exhibited some of the symptoms during the period of time prior to her hospitalization. Prior to trial, Schlitter had moved to suppress his statements made to law enforcement investigators during the March 30 interview at the state patrol office. The district court denied the motion, and the interview was entered into evidence.

Investigators also discovered Parmer had made inculpatory statements to two people. On one occasion, Parmer made a spontaneous statement to a coworker that she "might have killed a kid." Another time, Parmer was in her apartment with the coworker and a man she was dating. Parmer suddenly started crying and told the man, "You don't want to get involved with me." She then explained that she had

taken an eighteen-month-old's life. She further explained that the child was K.S., and it involved a head injury.

At the close of all the evidence at trial, trial counsel for Schlitter moved for a judgment of acquittal. The motion, however, was limited to the sufficiency of the evidence to support the crime of first-degree murder. The trial court overruled the motion.

The jury found Schlitter guilty of involuntary manslaughter by commission of public offense (child endangerment) and child endangerment resulting in death. A general verdict was returned, and the jury did not identify the alternative theories relied upon to support the guilty verdict for child endangerment. Schlitter moved for a new trial and arrest of judgment. After a hearing on February 20, 2013, the trial court denied Schlitter's motions and sentenced Schlitter. The court merged the sentences for the two charges under the one-homicide rule. It imposed a mandatory indeterminate fifty-year sentence for child endangerment resulting in death and ordered $150,000 restitution to be paid to Nicole King. Although the State requested a thirty-year minimum sentence before parole eligibility, the court declined to require a minimum sentence before parole eligibility, leaving that question to the board of parole.

Schlitter appealed and raised four claims of error. First, he claimed the district court erred in failing to suppress his statements made during the interrogation on March 30. Second, he claimed his trial counsel was ineffective for failing to challenge the sufficiency of evidence to support the lesser included offense of involuntary manslaughter to the charge of first-degree murder and the alternative theories to the crime of child endangerment. Third, he claimed his trial counsel was ineffective for failing to timely object to improper comments by the prosecuting

attorney during closing argument. Finally, he claimed his trial counsel was ineffective for failing to investigate properly.

We transferred the case to the court of appeals. It affirmed the judgment and sentence of the district court. It found Schlitter was not in custody during the interrogation on March 30, and the law enforcement officers were not required to give Schlitter his *Miranda* warnings. It also found Schlitter failed to preserve error on his secondary claim that the statements were involuntary. The court of appeals further found that trial counsel was not ineffective because sufficient evidence was presented to support all the charges. It also found trial counsel was not ineffective because, even if the prosecutor's statements amounted to misconduct, no prejudice resulted. Finally, it found trial counsel was not ineffective for failing to conduct a proper investigation.

Schlitter sought, and we granted, further review. The only issue Schlitter raised was that his trial counsel was ineffective for failing to move for a judgment of acquittal for the crimes for which he was convicted.

## II. Scope of Review.

Ineffective-assistance-of-counsel claims are reviewed de novo. *State v. Tompkins*, 859 N.W.2d 631, 636 (Iowa 2015). Ineffective-assistance-of-counsel claims require a showing by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice. *Anfinson v. State*, 758 N.W.2d 496, 499 (Iowa 2008). We review sufficiency-of-the-evidence challenges for correction of errors at law. *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013).

We review constitutional issues, including *Miranda* violations, de novo. *See State v. Kooima*, 833 N.W.2d 202, 205 (Iowa 2013). We

examine the totality of the circumstances in the entire record in our evaluation. *State v. Baldon*, 829 N.W.2d 785, 789 (Iowa 2013).

### III. Analysis.

The right to effective assistance of counsel stems from the general right to counsel under the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution. *State v. Ambrose*, 861 N.W.2d 550, 556 (Iowa 2015). "To succeed on a claim of ineffective assistance of counsel, a claimant must establish by a preponderance of the evidence: '(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice.'" *State v. Thorndike*, 860 N.W.2d 316, 320 (Iowa 2015) (quoting *State v. Adams*, 810 N.W.2d 365, 372 (Iowa 2012)). The claimant must establish both elements of the claim. *Dempsey v. State*, 860 N.W.2d 860, 868 (Iowa 2015).

For the first element, we presume the attorney performed competently, requiring the claimant to rebut the presumption with evidence the attorney performed outside the standard of a reasonably competent practitioner. *Id.* To prove prejudice for the second element, the claimant needs to show the attorney's errors functionally deprived the defendant of a fair trial and further show by a reasonable probability that the result of the proceeding would have been different without the errors by the attorney. *State v. Ross*, 845 N.W.2d 692, 698 (Iowa 2014).

### A. Failure to Move for Judgment of Acquittal on Child-Endangerment Alternatives.

"To preserve error on a claim of insufficient evidence[, a] defendant must make a motion for judgment of acquittal at trial . . . ." *State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004). The motion must be made after the evidence on either side of the case has been presented. Iowa R. Crim. P. 2.19(8)(*a*).

When presented with a motion for acquittal, courts must view "the evidence in the light most favorable to the State and draw[] all fair and reasonable inferences from it, taking all the evidence into consideration, both direct and circumstantial." *State v. Duncan*, 312 N.W.2d 519, 522 (Iowa 1981) (citations omitted). This standard requires courts to assume the truth of the evidence offered by the prosecution. *Nguyen v. State*, 707 N.W.2d 317, 327 (Iowa 2005). The evidence must be sufficient to convince a rational fact finder that the defendant is guilty beyond a reasonable doubt. *State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006). A fair inference of guilt is necessary, not merely suspicion, speculation, or conjecture. *State v. Geier*, 484 N.W.2d 167, 171 (Iowa 1992).

Counsel for Schlitter did not challenge the sufficiency of the evidence to support any of the alternative theories of guilt for a finding of child endangerment. We must consider if he failed to perform within "the range of normal competency" by determining if a competent attorney would have challenged the sufficiency of the evidence. *State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003). If counsel failed to raise a meritorious issue a normally competent attorney would have raised, and such failure cannot "be attributed to reasonable trial strategy, then we can conclude the defendant has established that counsel failed to perform an essential duty." *Id.* at 870.

In its case against Schlitter, the State presented four alternatives of guilt to the jury on the charge of child endangerment. The trial court instructed on each alternative. The jury was told they could find Schlitter committed child endangerment if they found he had done any of the following alternatives:

> a. Knowingly acted in a manner that created a substantial risk to [K.S.]'s physical health or safety; or

b.   By an intentional act or series of intentional acts used unreasonable force that resulted in bodily injury or was intended to cause serious injury; or

c.   Willfully deprived [K.S.] of necessary supervision or medical care appropriate to her age, being reasonably able to make such necessary provisions, which deprivation substantially harmed [K.S.]'s physical health; or

d.   Knowingly permitted the continuing physical abuse of [K.S.].

Counsel did not move for judgment of acquittal on any of the alternatives presented based on insufficient evidence but, rather, conceded to a jury question on the child endangerment charge. Thus, if the evidence presented by the State at trial was insufficient to support any alternative, Schlitter's trial counsel would have provided ineffective assistance by failing to raise the issue and permit the trial court to enter a judgment of acquittal on any alternative not supported by sufficient evidence.

We often do not address ineffective-assistance-of-counsel claims on direct appeal because a record is needed to fully develop the claim and identify the existence of any trial strategies that may have influenced the actions or inactions of trial counsel. *See State v. Ondayog*, 722 N.W.2d 778, 786 (Iowa 2006) ("[P]ostconviction proceedings are often necessary to discern the difference between improvident trial strategy and ineffective assistance."). However, no reasonable trial strategy could permit a jury to consider a crime not supported by substantial evidence. *See State v. Brubaker*, 805 N.W.2d 164, 174 (Iowa 2011) (holding counsel ineffective for failing to move for judgment of acquittal based on insufficient evidence to support a necessary element of the charged crime and noting such a failure "is not a trial strategy"). Therefore, we must review each alternative theory of the crime of child endangerment to determine if a reasonable trial counsel would have moved for judgment of acquittal on any of the four alternatives.

1. *Knowingly acted in a manner that created substantial risk to physical health or safety.* We first consider the sufficiency of evidence to support a finding that Schlitter knowingly acted in a manner that created a substantial risk to the physical health or safety of K.S. The term "knowingly" not only refers to the act, but also the creation of a substantial risk to physical health or safety. *State v. James,* 693 N.W.2d 353, 355–57 (Iowa 2005). Additionally, "the definition of 'substantial risk' in the context of child endangerment" means "[t]he very real possibility of danger to a child's physical health or safety." *State v. Anspach,* 627 N.W.2d 227, 233 (Iowa 2001). The risk does not have to be likely, just real or identifiable. *Id.* at 232–33. The evidence offered by the State at trial targeted Schlitter either as the abuser or complicit in abuse inflicted by Parmer by failing to intervene to stop or prevent it.

The State presented an abundance of evidence that K.S. sustained bruises to her head on separate occasions in the weeks leading up to her death. A number of people noticed bruises the week of March 8— including family members, day-care workers who saw her every day, and a nurse practitioner. Evidence was presented that either Schlitter or Parmer used makeup to cover bruising around K.S.'s eye and forehead. One week later, a new bruise appeared on K.S.'s forehead in the same location as the previous bruise.

Construing the evidence in favor of the State, a reasonable jury could find beyond a reasonable doubt that, even if Parmer was the abuser instead of Schlitter, he knew that K.S. was at risk of physical injury while in the sole care of Parmer. The jury could have also found Schlitter knowingly acted in a manner that created a substantial risk to the physical health or safety of K.S. by leaving her in the care of Parmer.

2. *By an intentional act or series of intentional acts used unreasonable force that resulted in bodily injury or was intended to cause serious injury.* To prove the second alternative, the State must present sufficient evidence that Schlitter either committed an act resulting in the injury or had sole care of K.S. during the time in which the injury occurred. *See Neiderbach*, 837 N.W.2d at 219. The evidence presented at trial clearly supported a finding that a series of intentional acts of unreasonable force were inflicted on K.S. and that these acts resulted in the bodily injury she suffered. However, the evidence does not reasonably support a finding either that Schlitter committed the violent acts or that he had sole care of her when the injuries were sustained. During the period of time prior to discovery of the first bruises on K.S., numerous people other than Schlitter had cared for her. These caretakers included Parmer, day-care providers, King, and several members of Schlitter's family. Likewise, K.S. had been in the care of several people prior to the time the second set of bruises was discovered. Additionally, K.S. had been in the care of both Schlitter and Parmer prior to the injuries that led to K.S.'s hospitalization and death. Finally, Schlitter was not with K.S. during the two hours prior to the 911 call. There was no testimony that Schlitter had ever inflicted unreasonable force on K.S. in the past or that he had ever shaken her. To the contrary, the evidence was consistent that Schlitter may have yelled at her when frustrated, but he typically would leave the room to cope with his frustration.

In our careful consideration of all the evidence in the light most favorable to the State, we cannot conclude that a reasonable jury could find Schlitter inflicted the force on K.S. that resulted in her injuries. Such a finding could only be based on speculation. Speculation and

conjecture cannot be used to support a verdict. *See State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002) ("The evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture."). Thus, the second alternative could not support a guilty verdict for child endangerment, and Schlitter's counsel was ineffective for failing to move for a judgment of acquittal on this alternative. The jury should not have been instructed to consider this alternative in considering Schlitter's guilt, and Schlitter's trial counsel failed to perform an essential duty by failing to object to the submission of the alternative to the jury. Furthermore, we also find from this record that prejudice resulted to Schlitter when his trial counsel failed to move for a judgment of acquittal on this alternative. It is not possible to know whether or not the jury relied on this alternative in reaching its verdict. *See State v. Tyler*, 873 N.W.2d 741, 753–54 (Iowa 2016) (holding we reverse a general verdict when not all theories are supported by sufficient evidence). Consequently, there is no way to know if the jury refrained from relying on this alternative in reaching their verdict.

Accordingly, Schlitter must be given a new trial based on ineffective assistance of counsel. A new trial cannot include the second alternative theory for the crime of child endangerment.

3. *Willfully deprived K.S. of necessary supervision or medical care.* We now proceed to consider the sufficiency of the evidence to support the remaining two alternatives of child endangerment. If insufficient evidence was not presented, the alternative cannot be submitted at the new trial.

The third alternative required proof that Schlitter willfully deprived K.S. of necessary supervision or medical care he was reasonably able to provide and the deprivation substantially harmed her physical health.

"Willfully" is defined either as "said or done deliberately or intentionally" or "established by proof of intentional and deliberate conduct undertaken with a bad purpose, in disregard for the rights of another, or contrary to a known duty." *State v. Leckington*, 713 N.W.2d 208, 214 (Iowa 2006) (quoting *State v. Tippett*, 624 N.W.2d 176, 178 (Iowa 2001) (first quote)) (finding either definition appropriate for this subsection of the child endangerment statute in that particular case). In *Leckington*, the defendant saw an intoxicated minor suffer an injury, left him alone in an unsupervised location without healthcare, and then tried to remove him from her house while he was unconscious and foaming from the mouth rather than call for help in an effort to avoid a criminal investigation. *Id.* at 214–15. We found the delay and the seriousness of the minor's condition satisfied the requirement of willful deprivation of medical care. *Id.* at 215.

In this case, there was evidence that K.S. exhibited numerous signs of abuse and head trauma. On the other hand, she also exhibited signs of more normal childhood illness or infection. Schlitter took K.S. to the doctor on numerous occasions and called the medical clinic several times. He also administered medication prescribed by the doctor. Schlitter, however, did not seek medical care for K.S.'s most serious symptoms. The doctors testified at trial that the symptoms of head trauma would have been obvious to anyone. In particular, Dr. Oral testified that the symptoms exhibited by K.S., such as lethargy, decreased appetite, pulling hair, nightmares, multiple bruises from distinct time periods, and lack of playfulness even after she had healed from the conjunctivitis and ear infection, combined with the repeated injuries to her forehead were far enough outside normal child behavior that a reasonable caretaker would have sought medical care.

We conclude a reasonable jury could have found that Schlitter knew of the abuse occurring to K.S. and chose not to seek medical attention for the resulting injuries, such as facial bruising and other abnormal symptoms. A reasonable jury could have found Schlitter willfully deprived K.S. of medical care despite the ongoing symptoms of excessive sleep and failure to eat. It could have further found that Schlitter purposely did not take K.S. in for treatment to avoid the risk of exposure and an investigation, a risk he knew was possible after the March 16 visit with DHS regarding the bruise on K.S.'s forehead.

4. *Knowingly permitted the continuing physical abuse of K.S.* Finally, we consider the alternative that Schlitter committed child endangerment by knowingly permitting the continuing physical abuse of K.S. In *State v. Watkins*, we held that continuous proximity to a child abused by a person was sufficient to find a defendant knowingly permitted the continuing physical abuse of the child. 659 N.W.2d 526, 536–37 (Iowa 2003). To make its case, the State had to show Schlitter actually knew Parmer was abusing K.S., not just that K.S. always ended up with odd, significant bruises after her care, even if plausible explanations for the bruises existed.

Construing the evidence in a light most favorable to the State, this alternative was supported by sufficient evidence. Schlitter's explanations for the origin of the forehead bruises were not consistent, and he provided no reason for his inconsistencies. Further, a reasonable jury could find he knew the bruising on March 8 was covered with makeup in an attempt to hide the injury. A jury could also reasonably believe a parent would not seek to hide bruises on a toddler with makeup. Construing the evidence in the light most favorable to the State, the jury could have inferred that K.S. was being abused and that Schlitter

knowingly permitted the abuse to continue by failing to take action to remove her from the care of the abuser.

**B. Failure to Move for Judgment of Acquittal on the Lesser Included Offenses of Murder.** Schlitter also claims his trial counsel should have sought an acquittal on the lesser offense to murder of involuntary manslaughter by public offense because the State failed to establish sufficient evidence to prove the public offense of child endangerment. Even if we recognized a duty to move for judgment of acquittal on lesser included offenses after denial of a motion to acquit on the greater offense, because we find sufficient evidence to support three of the alternatives of child endangerment, this claim must fail.

**C. Claim of Error by Prosecutor.** We proceed to consider other issues raised by Schlitter on appeal to determine if they will impact the retrial. Because a new trial will be necessary, we will exercise our authority to promote efficiency and judicial economy by addressing those issues raised on appeal that will likely reoccur at the retrial.

During closing argument, the prosecutor made an emotional appeal to the jurors by telling them that the jury system gives control to "citizens to hold each other accountable for criminal behavior." He also told the jurors that they had the "sacred duty of protecting the safety of the public and of the innocent by judging those that commit brutal acts of abuse and neglect against fellow humans to be guilty when it's been shown beyond a doubt that's reasonable." Additionally, the prosecutor informed the jurors that they had an "important honor" to "protect the rights of citizens and acknowledge those rights and find [offenders] accountable through the rest of us."

Counsel for Schlitter objected to these statements after deliberations had begun. The district court ultimately found the

statements did not amount to prosecutorial misconduct.  Based on this ruling, Schlitter raised a claim of prosecutorial misconduct on appeal.

At the outset, we observe that the term "prosecutorial misconduct" has gained a specialized meaning within the law:

> to describe conduct by the government that violates a defendant's rights whether or not that conduct was or should have been known by the prosecutor to be improper and whether or not the prosecutor intended to violate the Constitution or any other legal or ethical requirement.

ABA House of Delegates, Recommendation 100B, at 1 (2010), http://www.americanbar.org/content/dam/aba/directories/policy/2010 _am_100b.pdf [hereinafter ABA Recommendation].  We have followed this approach by broadly describing trial conduct of a prosecutor in a criminal case that is claimed to deprive the defendant of a fair trial to be prosecutorial misconduct.  *See Graves*, 668 N.W.2d at 870.  The range of trial conduct by prosecutors falling into the category of claims referred to as "prosecutorial misconduct" includes questioning witnesses about others' deceit, distorting testimony, making unsupported statements during closing argument, stating the defendant lied during testimony, diverting the jury from deciding the case based on the evidence, making other inflammatory or prejudicial statements about the defendant, and more.  *State v. Musser*, 721 N.W.2d 734, 754–55 (Iowa 2006) (referring to improper closing argument that urges the jury to decide the case on something other than the evidence as prosecutorial misconduct); *State v. Carey*, 709 N.W.2d 547, 552 (Iowa 2006) (referring broadly to claims of improper closing argument by the prosecutor as claims of misconduct); *Graves*, 668 N.W.2d at 870–71 (collecting cases).  While some of the conduct in these cases may have been intentional, other conduct can be the result of mistake or error during the heat of trial.

The problem with describing all claims as prosecutorial misconduct is that the term tends to conflate prosecutorial misconduct with professional misconduct as controlled by our Iowa Rules of Professional Conduct. ABA Recommendation, at 1; Shawn E. Minihan, *Measuring Prosecutorial Actions: An Analysis of Misconduct versus Error*, Prosecutor, Dec. 2014, at 22, 23 [hereinafter Minihan]; *see also* Iowa R. Prof'l Conduct 32:8.4 (defining professional misconduct). The two phrases are not only similar in their language, but tend to connote similar meanings. Yet, professional misconduct generally applies to intentional misbehavior on the part of the attorney, while prosecutorial misconduct is not always intentional. Iowa R. Prof'l Conduct 32:8.4; ABA Recommendation, at 2. In 2010, the American Bar Association (ABA) adopted a recommendation urging courts to be careful in distinguishing between prosecutorial misconduct and prosecutorial error and to attach different levels of culpability for each. ABA Recommendation, at 2–3.

One author has offered helpful guidance on how to distinguish between prosecutorial misconduct and prosecutorial error.[1] Minihan, at 24–25. Prosecutorial misconduct includes those statements "where a prosecutor intentionally violates a clear and unambiguous obligation or standard imposed by law, applicable rule or professional conduct," as well as "those situations where a prosecutor recklessly disregards a duty to comply with an obligation or standard." *Id.* at 24–25. Prosecutorial error occurs "where the prosecutor exercises poor judgment" and "where

---

[1]Minihan based distinction between prosecutorial misconduct and error on an analytical framework developed by the Office of Professional Responsibility for the United States Department of Justice. Minihan, at 24–25; Office of Prof'l Responsibility, U.S. Dep't of Justice, *Analytical Framework* (2005), https://www.justice.gov/sites/default/files/opr/legacy/2006/03/15/framework.pdf.

the attorney has made a mistake" based on "excusable human error, despite the attorney's use of reasonable care." *Id.* at 25. This distinction also conforms to the general definitions for misconduct and a trial error. *Compare Misconduct, Black's Law Dictionary* (10th ed. 2014) (defining misconduct as "[a]n attorney's dishonesty or attempt to persuade a court or jury by using deceptive or reprehensible methods"), *with Trial Error, Black's Law Dictionary* (defining trial error as "[a] mistake in or deviation from proper trial procedure during the presentation of a case to a jury"). Going forward, we adopt the ABA's recommendation on our review of prosecutorial behavior and distinguish between incidences of prosecutorial error and prosecutorial misconduct. A prosecutor who has committed error should not be described as committing misconduct.

We discussed the role of the prosecutor in criminal cases in *Graves*, 668 N.W.2d at 870. We also identified a multifactor test to evaluate the statements made during closing arguments in determining if there was misconduct and if that misconduct was prejudicial. *Id.* at 877–78. These same factors easily translate to an evaluation of prosecutorial error.

In this case, the claim raised by Schlitter was actually describing error by the prosecutor, not prosecutorial misconduct. It is unnecessary, however, for us to apply the *Graves* factors to this claim or to address the additional claim whether trial counsel was ineffective for failing to lodge a timely objection to the closing argument of the prosecutor. The claim of error by the prosecutor based on the statements made during closing argument rests with the unique and particular choice of words, as well as the particular surrounding circumstances. It is unlikely the prosecutor will make the same choice of words or that the same circumstances will be repeated during the retrial. Accordingly, we do not

resolve the issue, but remind counsel on retrial to be mindful of the scope of closing arguments described in *Graves*.

**D.** *Miranda* **Violation.** Schlitter was interviewed by law enforcement officers on several occasions, including an interview at a state patrol office on March 30, 2010. He moved to suppress statements made to officers during this interview because he was not given the *Miranda* warnings and because his statements were involuntary based on promises of leniency. In particular, at the suppression hearing, Schlitter's objections to the March 30 interview centered on two areas. First, he objected to the nature of the interrogation. Second, he objected because the officers continued to question him after he asked them to stop once they began to graphically describe the possible ways K.S. could have received her injuries. On appeal, however, Schlitter primarily objected to the admission of his statements from the interview describing his frustration with K.S., the possibility that he had picked up K.S. roughly, and his implicit defense of Parmer.

The district court found the officers made no statements that resembled any promise of leniency. It also found Schlitter was not in custody during the interview, and the officers were not required to give him the *Miranda* warnings. The court held Schlitter was not in custody because he was allowed to and did leave the interview at his own will. This issue will be raised again on retrial, and we proceed to resolve it on this appeal. In doing so, we agree the record does not disclose any promises of leniency. Thus, we proceed to decide if Schlitter was in custody at any time during the interview.

We begin by recognizing that Schlitter raised the *Miranda* issue under both the United States and Iowa Constitutions. He did not propose, however, that we consider a different standard for determining

whether he was in custody under the Iowa Constitution than followed under the federal caselaw. As a result, with respect to the Iowa constitutional claim, we apply the prevailing federal standard, but reserve the right to apply that standard in a different fashion from the federal caselaw. *See State v. Becker*, 818 N.W.2d 135, 150 (Iowa 2012).

Law enforcement officers are required to give *Miranda* warnings when a suspect is in custody and subjected to interrogation. *State v. Tyler*, 867 N.W.2d 136, 171 (Iowa 2015) (discussing the warnings police must give based on *Miranda v. Arizona*, 384 U.S. 436, 471, 478–79, 86 S. Ct. 1602, 1626, 1630, 16 L. Ed. 2d 694, 722, 726 (1966)). "[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive [the] circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662, 124 S. Ct. 2140, 2148, 158 L. Ed. 2d 938, 950 (2004). Custody occurs "upon formal arrest or under *any other circumstances* where the suspect is deprived of his or her freedom of action in *any* significant way." *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009)). This standard seeks to apply the *Miranda* requirements to coercive atmospheres, not just coercive places. It uses a case-by-case evaluation of all the circumstances existing at the time of the interrogation. The factors used to determine custody include

> (1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning.

*State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997).

In a *Miranda* claim, interrogation consists of the express questioning and words and actions beyond those normally part of arrest and custody "that the police should know are reasonably likely to elicit

an incriminating response from the suspect." *State v. Miranda*, 672 N.W.2d 753, 761 (Iowa 2003) (quoting *State v. Peterson*, 663 N.W.2d 417, 424 (Iowa 2003)). The State has not separately addressed whether an interrogation occurred and so has waived any argument to the contrary. *See id.* Therefore, if we determine Schlitter was in custody then the officers would have been required to inform him of his *Miranda* rights.

We first consider the circumstances concerning how the individual was summoned to the interrogation. *Countryman*, 572 N.W.2d at 558. An officer called Schlitter and asked if he would be willing to come to his office at the state patrol office on a later date to answer some more questions. The officer did not physically approach Schlitter, bring him to the station in a police vehicle, or otherwise force Schlitter to the interview but rather made a request and arrangements for Schlitter to come in another day. *Cf. State v. Bogan*, 774 N.W.2d 676, 680–81 (Iowa 2009) (finding custody when principal pulled student out of class and walked him to the office followed by officers, and the student did not volunteer or acquiesce to speaking with police). There is no indication Schlitter attempted to decline the request or showed any reluctance to attend the interview.

We next consider the purpose, place, and manner of interrogation. *Countryman*, 572 N.W.2d at 558. With respect to the manner of questioning, we consider how long it lasted, "the number of persons conducting the questioning, the number of breaks taken during the questioning, the availability of restroom breaks or other breaks, and the type of questioning in which those conducting the interview engage." *Tyler*, 867 N.W.2d at 172–73. In *Tyler*, we noted that even a three-hour interview was not necessarily custodial. *Id.* at 172. On the other hand, even brief interviews that the individual knows will continue until the

desired answer is given can be custodial. *Miranda*, 672 N.W.2d at 760. Interrogation at a police station is generally a more coercive environment than questioning a suspect away from the station, but "merely because questioning takes place at the police station" does not necessarily implicate custody. *State v. Smith*, 546 N.W.2d 916, 922 (Iowa 1996).

The purpose of the encounter in this case was to get Schlitter to confess to being the perpetrator of the physical injuries suffered by K.S. or to get him to implicate Parmer. Schlitter was a focus of the interrogation, but so was another person. Schlitter suspected he and Parmer were targets of the investigation, as did others, including family members. Schlitter had talked with law enforcement investigators on several occasions prior to the March 30 encounter and had consistently denied any responsibility for the injuries inflicted on K.S. The questioning took place in an interview room and lasted about one hour and twenty minutes. The officers did not call Schlitter to the patrol office with the intent to detain or arrest him, nor did they indicate any such intent to Schlitter.

During the interview, Schlitter sat in a chair against a wall between a desk and a table. A camera was located directly in front of him. Two officers were in the room during the interview, but only one asked Schlitter questions. The officers wore plain clothes. One officer was behind a desk, and the interviewing officer sat in a chair by the table facing Schlitter. This arrangement placed the officer between Schlitter and the door. He inched closer to Schlitter throughout the questioning, moving from around two feet away to nearly knee-to-knee, then moving back by the table.

It is clear the officers applied forceful verbal pressure on Schlitter as the questioning progressed. The pressure included a strong and

graphic description of the injuries inflicted on K.S. The officer implied Schlitter inflicted the injury and confronted Schlitter with the inconsistency between his denial of any responsibility and his declaration that Parmer was a good mother and never violent. The type and amount of pressure used by the officers tended to make the atmosphere coercive. The pressure was not just for Schlitter to implicate Parmer but also for him to confess in the alternative. Schlitter thought the aggressive pressure was unfair and asked the officer several times to stop.

The officers also asked Schlitter if he would consent to a polygraph examination. Schlitter said he would consent to a polygraph test but wanted to take it the following day because it was getting close to dinnertime. After the officers pressed for Schlitter to immediately take the test, he requested to talk to his lawyer. When Schlitter was unable to reach his lawyer by phone, the officers again pressed for him to take the test, but then agreed it could be done the following day. Schlitter told the officers that he would come back the next day, stating, "[I]f that's when you want me here."

The third factor looks at "the extent to which the defendant is confronted with evidence of [his] guilt." *Countryman*, 572 N.W.2d at 558. During this interview, the officer described the actions that could have caused K.S.'s injuries, such as striking her head, shaking her violently, or dropping her. The officer continued to describe each of those scenarios in more detail. He told Schlitter that abused children cling to their abuser and do not run away from the one abusing them. The officer then continued asking if Schlitter somehow hit K.S.'s head on anything while carrying her or lifting her. He implied that Schlitter picked K.S. up too fast and squeezed her hard enough to cause the

bruising without realizing the hold was too rough or accidentally squeezed her out of frustration. The officer asked to trace Schlitter's hand, suggesting it could help identify the source of bruising to K.S.'s face. The officer told Schlitter his explanations were not credible and pointed out the bruising on K.S. only began after he became the custodial parent.

The amount of evidence of Schlitter's guilt as the perpetrator presented to him during the interview was not significant. Schlitter did not make a confession, nor did the officer present any evidence to him showing Schlitter was directly responsible for K.S.'s injuries. Although the atmosphere became highly accusatory at a point, the evidence presented to Schlitter was circumstantial and speculative in nature.

The final factor considered to establish custody is whether the individual was free to leave the place of questioning. *Id.* One element of this is the degree of physical restriction placed on the individual. *Smith*, 546 N.W.2d at 925. Schlitter's path to the exit was partially blocked by the interviewing officer. Additionally, the officers did not open the interview by telling Schlitter he was free to leave when he wanted. However, when the officers left the room, Schlitter had free access to the door. He was not handcuffed at any point during the interview, and the door to the room was not locked. He drove himself to the station and was not dependent on the officers to drive him home. *See Tyler*, 867 N.W.2d at 174 (finding no custody even when the individual had been brought by officers to the police station when the individual was told she was free to leave and that she would be given a ride). Although Schlitter became upset during the interview, at no time did his demeanor indicate he felt he would not be allowed to leave. In fact, when Schlitter told the officers towards the end of the interview that he could not remain long

enough to take a polygraph examination because he needed to leave for dinner with his family, they attempted to talk him into staying for the test, but allowed him to leave without doing so. *See Countryman*, 572 N.W.2d at 558 (finding no custody when individual was not restrained, never asked to leave, and officer testified he would have tried to talk her out of leaving but would have allowed it). Importantly, this exchange indicated Schlitter did not consider himself to be in custody, but free to leave to have dinner with his family.

Considering the totality of the circumstances, we conclude Schlitter was not in custody at the time he entered the interrogation room of the patrol office. He cooperatively talked to officers in the days preceding the interview and, under the circumstances, would not have been alarmed to learn they wanted to talk to him again. He voluntarily went to the patrol office. The request to meet at the patrol office and to go into the interview room could not be viewed reasonably as a significant restraint on Schlitter's freedom of movement. The difficult question is whether the circumstances that followed deprived Schlitter at any point of his freedom to a degree similar to a formal arrest. *See Miranda*, 672 N.W.2d at 759 (noting *Miranda* safeguards apply as soon as the person is deprived of freedom to the level of a formal arrest). A coercive environment, whether by formal arrest or otherwise, gives rise to custody, which requires the protections of *Miranda*. *See id.*

The strength of Schlitter's claim of custody is found in the aggressive and accusatory nature of the questioning. The approach taken by the investigating officers was consistent with the type of circumstances that can make suspects feel a coercive atmosphere of custody. The more an interrogating officer discloses evidence of guilt to a suspect and the more force the officer uses to express guilt to a suspect,

the greater likelihood the suspect will be in custody for purposes of *Miranda.* *Cf. Tyler*, 867 N.W.2d at 173–74 (distinguishing between accusatory and truth-seeking questioning); *Smith*, 546 N.W.2d at 925 (noting questions about conflicting stories was to find information rather than to confront the defendant with evidence of guilt); *see also United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990) ("[T]he fact that the individual has become the focus of the investigation is relevant 'to the extent that the suspect is aware of the evidence against him' and this awareness contributes to the suspect's sense of custody." (quoting *United States v. Carter*, 884 F.2d 368, 370 (8th Cir. 1989))). Yet, Schlitter understood the officers were asking him either to acknowledge his guilt or implicate Parmer. Even during the aggressive questioning, Schlitter understood the officers were looking at one or the other as the guilty party. Thus, if the officers wanted Schlitter to implicate Parmer, a necessary inference would be the officers lacked evidence of his guilt. Likewise, the request to trace his hand and to take a polygraph examination did not support custody under the circumstances, but confirmed the ongoing nature of the investigation and the ongoing search for more evidence. Even though the officers wanted to press on with the questioning and with the polygraph test when Schlitter wanted to end the encounter, the questioning did promptly end, and Schlitter did agree to return the next day. Schlitter indicated he did not believe the interview had evolved into a custodial setting by telling the officers near the end of the interview he would need to take the requested polygraph examination another time because he needed to be leaving for dinner. Under all the circumstances, and balancing all four factors, we conclude, as did the district court, the interrogation did not restrict Schlitter's

freedom to the point that it rendered him in custody for purposes of *Miranda.*

### IV. Conclusion.

We conclude the district court did not err in denying the motion to suppress. However, we conclude insufficient evidence was presented at trial to support a conviction for child endangerment under the theory that Schlitter used unreasonable force that resulted in bodily injuries to K.S. As a result, trial counsel for Schlitter was ineffective for failing to preserve error. We therefore reverse and remand for a new trial. In light of the need for a new trial, it is unnecessary to address further the other issues raised by Schlitter on appeal. We allow the decision of the court of appeals to stand as a final decision on the claim of ineffective assistance of counsel relating to the failure to investigate.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Wiggins, J., who concurs in part and dissents in part, and Appel, J., who files a separate opinion concurring in part and dissenting in part in which Wiggins and Hecht, JJ., join.

**WIGGINS, Justice (concurring in part and dissenting in part).**

I join Justice Appel's opinion that concurs in part and dissents in part to the majority opinion. However, I am compelled to write further on the use of special interrogatories in criminal cases. I see too many judges not using them when appropriate.

As demonstrated by this case and *State v. Tyler*, 873 N.W.2d 741, 753–54 (Iowa 2016), a new trial is required when the evidence is insufficient to support a guilty verdict on an alternative theory of criminal liability submitted to a jury and the jury returned a general guilty verdict. Appropriate use of special interrogatories can avoid new trials.

Under limited circumstances, our present law allows jurors to unanimously convict a defendant even when they do not agree on a single theory of criminal liability. *See State v. Bratthauer*, 354 N.W.2d 774, 776–77 (Iowa 1984). So long as the alternative means of committing an offense submitted to the jury are consistent with and not repugnant to each other, the jury can convict a defendant without agreeing to the precise means by which the defendant committed the offense. *Id.* When the district court submits consistent alternate theories of liability to the jury, it *may* submit special interrogatories that will permit it to determine which jurors agree on each alternative theory, but it is not required to do so.

In contrast, juror unanimity as to the means by which an offense was committed is required to sustain a conviction when the alternative means submitted to the jury are inconsistent, repugnant, or conceptually distinguishable from each other. *See* Tim A. Thomas, Annotation, *Requirement of Jury Unanimity as to Mode of Committing Crime Under*

*Statute Setting Forth the Various Modes By Which Offense May Be Committed*, 75 A.L.R. 4th 91, 105 (1990). In such cases, jurors must reach unanimity as to the means by which the defendant committed the offense. Thus, the district court *must* submit special interrogatories to the jury to convict the defendant when the alternative means submitted to the jury are inconsistent, repugnant, or conceptually distinguishable from each other.

Therefore, to determine whether special interrogatories are necessary, a district court must make two distinct legal determinations. *Bratthauer*, 354 N.W.2d at 776. First, the court must determine if the legislature intended the relevant statute to define "a single offense that may be committed in more than one way or instead defines multiple offenses." *Id.* Second, the court must apply a constitutional test and determine if the alternative means for committing the offense are inconsistent, repugnant, or are conceptually distinguishable. *Id.*

Only after a district court has completed this two-step analysis will it be in the position to decide what type of special interrogatories, or instructions, if any, it may need to give the jury in regards to its verdict.[2]

---

[2]The model jury instructions published by the Iowa State Bar Association include the following instruction:

> Where two or more alternative theories are presented, or where two or more facts would produce the same result, the law does not require each juror to agree as to which theory or fact leads to his or her verdict. It is the verdict itself which must be unanimous, not the theory or facts upon which it is based.

Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 100.16 (2015).

It appears the present practice among district courts is to give this instruction when the alternative means submitted to the jury are not inconsistent, repugnant, or conceptually distinguishable from each other. Again, the court may want to consider submitting some form of interrogatories to avoid a retrial in case an appellate finds the evidence was insufficient to submit one of the alternative ways to commit an offense.

**APPEL, Justice (concurring in part and dissenting in part).**

I concur with the balance of the majority opinion but dissent on the question of whether Schlitter was subjected to an unwarned interrogation contrary to *Miranda v. Arizona* under the United States and Iowa Constitutions. 384 U.S. 436, 444–45, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694, 706–07, (1966).

## I. Factual and Procedural Background.

The record reveals that law enforcement officers requested Schlitter to come to the state patrol office for questioning in connection with the death of his daughter. Schlitter drove himself to the station. He was then escorted to an interrogation room. The interrogation room had two steel desks. Schlitter sat in a chair with his back to the wall between the two desks. Two officers were in the interrogation room seated between Schlitter and the door. The door of the interrogation room was not locked. Schlitter was not advised at any time during the interrogation that the door was not locked, that he was not under arrest, or that he was free to go.

The interrogation began with basic background information. After a few minutes of questioning, however, the interrogation became accusatory. The interrogating officer asked about bruises on Schlitter's daughter, stating that "none of the bruising shows up until she's in your custody" and that Schlitter's answer of "I don't know" to questions about how the injuries occurred "doesn't cut it." The officer described the injuries and asked, "[H]ow does that happen . . . did you do those things?" The officer repeatedly stressed, "[W]e're down to two people, you and Amy (Schlitter's girlfriend)," as responsible for the injuries to his daughter. And the officer also stressed that Schlitter had told them that

"Amy's a good mother [and he'd] never seen her be violent." Schlitter grasped the point stating, "So, I'm pretty much incriminating myself."

For several minutes, the video recording of the interrogation reveals that the interrogating officer repeatedly confronted Schlitter and pressed him to admit responsibility for the injuries to his daughter. Under persistent questioning focusing on his responsibility for the injuries to his daughter, Schlitter finally declared, "Can you just stop?" The officer did not stop. He pressed on. He responded by aggressively stating, "But, but something happened. Okay? Something happened to your daughter." Schlitter responded, "You're getting too graphic and you're getting . . . ." But he was not allowed to finish his sentence when the officer interjected, "Something happened to your daughter and whatever happened to her, killed her." Schlitter declared, "I don't appreciate this!"

At this point, Schlitter asked, "Do I need my lawyer? Cause I don't appreciate this." The officer ignored him and observed, "We're just trying to find out . . . what happened." Schlitter again declared he did not appreciate the questioning and for a second time announced, "We need to stop!" To this the officer responded, "One of two people did [it]." Schlitter for the third time stated, "I, we need to stop. Please." The officer again ignored him and pressed on noting, "One of two people know what happened."

At this point, Schlitter backed off his previous unqualified denials of any involvement in his daughter's injuries. When asked once again whether he hurt his daughter, Schlitter now responded, "No. Not that I know of." When asked what he meant by that, Schlitter responded with the phrase, "Not purposely trying to hurt my daughter." When asked whether Schlitter became frustrated with his daughter on the day she

went to the hospital with severe injuries, Schlitter now stated that his daughter was not eating lunch and that he "picked her up to set her down on her mat a few times, 'cause she kept getting up." Schlitter then stated, "[I]t wasn't hard or extremely forceful. I picked her up, sat her down, and, uh, she did that enough times I had to take a break. Amy watched her for a few minutes."

The officers continued the interrogation. They ultimately asked to trace Schlitter's hand, suggesting that this technique would allow them to determine who caused bruising to his daughter's face. In apparent reference to other bruises, Schlitter stated that he picked her up a lot "like that" but never violently. When asked if his actions would cause bruising, he stated, "Shouldn't have been."

The interrogation continued for several minutes. The interrogating officer stated, "[I]t's you and Amy," "it's down to you two," and "it's down to you and Amy."

At this point, the officers asked Schlitter if he would be willing to take a polygraph test. Schlitter asked if he could do it tomorrow, and the officers responded that they would prefer he do it that same day. When Schlitter answered, "I'm supposed to be having dinner soon," an officer responded, "I think this is a bit more important than dinner right now."

In response to the request for a polygraph test, Schlitter stated, "I wanna talk to my lawyer, too." The officers allowed Schlitter to call his attorney. Schlitter could not reach her, however, and left a voice mail message. After learning that Schlitter could not contact his attorney, the officers continued questioning. An officer pressed the polygraph issue, stating that "the choice is really yours." Schlitter repeated, "I just wanna talk to my lawyer first . . . about everything that is going on here."

The officers continued to press for the polygraph. One officer stated, "You can walk out of here knowing that, you know, we don't think that you're, you're our person anymore . . . ." Ultimately the officers and Schlitter agreed that he would come back the next day for the polygraph. An officer asked Schlitter, "Okay. I have your, your word?" and Schlitter responded, "Yeah, if that's when you want me here, I'll come back." Schlitter stated that Amy was "too nice of a person to hurt any kid." The officer emphasized, "[U]ntil we can polygraph you and, and talk with Amy . . . it won't be over." The interrogation then ended.

**II. State and Federal Claims.**

In this case, Schlitter raises his *Miranda* claim under both the United States Constitution and the Iowa Constitution. Although the Iowa Constitution does not contain an explicit right against compelled self-incrimination, we have found such a right under the due process clause of the Iowa Constitution. *State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 518 n.2 (Iowa 2011) (citing *State v. Height*, 117 Iowa 650, 659, 91 N.W. 935, 938 (1902)).

In the aftermath of *Miranda*, the United States Supreme Court has embraced its core holding but generally limited the potentially protean scope of the case. State supreme courts have not consistently followed the Supreme Court's later caselaw under *Miranda* in the interpretation of their state constitutions.[3]

---

[3]*See, e.g., State v. Ketchum*, 34 P.3d 1006, 1021–25 (Haw. 2001) (elaborating on a more expansive definition of custody under article I, section 10 of the Hawaii Constitution); *People v. Griggs*, 604 N.E.2d 257, 268 (Ill. 1992) (rejecting *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), under the Illinois Constitution); *Commonwealth v. Smith*, 593 N.E.2d 1288, 1295 (Mass. 1992) (declining to follow *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985), on state law grounds in Massachusetts); *State v. Smith*, 834 S.W.2d 915, 919 (Tenn. 1992) (explaining that the Tennessee Constitution provides more protection than the Federal Constitution under *Miranda*); *see also State v. Tyler*, 867 N.W.2d 136, 186–87 (Iowa

In this case, however, Schlitter does not suggest that we should apply a different framework under the Iowa Constitution than is generally applied by the United States Supreme Court. As a result, we must apply the federal framework for the purpose of this case, but we reserve the right to apply the federal framework in a more restrictive manner. *See State v. Short*, 851 N.W.2d 474, 491 (Iowa 2014). Under these circumstances, this case does not stand for the proposition that departures from federal precedent will be rejected, but only that they have not been presented and therefore have not been ruled upon in the case presented.

Thus, the posture presented in this case is similar to *State v. Pals*, 805 N.W.2d 767 (Iowa 2011). In *Pals*, we considered the application of a totality-of-the-circumstances test to determine whether an individual had consented to a search. *Id.* at 777. Pals did not argue for a departure from the federal totality-of-the-circumstances test under the Iowa Constitution. *Id.* at 779–80. Consequently, we utilized the federal test, but applied it in a fashion more stringent than federal law. *Id.* at 782. Similarly, here we are faced with another totality-of-the-circumstances test under federal law. We apply the test, but may do so in a fashion at variance with federal law.

---

2015) (Appel, J., concurring part and dissenting in part) (citing state constitutional cases that decline to follow *Elstad*); Claudia R. Barbieri, Oregon v. Elstad *Revisited: Urging State Court Judges to Depart from the U.S. Supreme Court's Narrowing of* Miranda, 4 U. Dist. Colum. L. Rev. 63, 69–74 (1998); Arthur Leavens, *Prophylactic Rules and State Constitutionalism*, 44 Suffolk U. L. Rev. 415, 429–38 (2011); Katherine E. McMahon, *"Cat-Out-of-the-Bag"* & *"Break-in-the-Stream-of-Events": Massachusetts' Rejection of* Oregon v. Elstad *for Suppression of Warned Statements Made After a* Miranda *Violation*, 20 W. New Eng. L. Rev. 173, 201–08 (1998).

**III. Legal Framework for Evaluation of Custody Under United States Constitution.**

As noted by the majority, the United States Supreme Court has established a totality-of-the-circumstances test to determine if a person is in custody or if freedom is deprived "in any significant way."[4] *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706. Whether a person is in custody or has been deprived of freedom in any significant way is determined by examination of "all of the circumstances surrounding the interrogation." *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528–29, 128 L. Ed. 2d 293, 298 (1994). The Supreme Court has stated that relevant circumstances include, but are not limited to: the language used in summoning the interrogatee, *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938, 951 (2004); the location of the questioning, *see Maryland v. Shatzer*, 559 U.S. 98, 114, 130 S. Ct. 1213, 1225, 175 L. Ed. 2d 1045, 1059 (2010); its duration, *Berkemer v. McCarty*, 468 U.S. 420, 437–38, 104 S. Ct. 3138, 3149, 82 L. Ed. 2d 317, 333 (1984); statements made during the interrogation, *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714, 719 (1977) (per curiam); the presence or absence of physical restraints during the questioning, *New York v. Quarles*, 467 U.S. 649, 655, 104 S. Ct. 2626, 2631, 81 L. Ed. 2d 550, 556 (1984); and whether the interrogatee is released at the end of the questioning, *California v. Beheler*, 463 U.S. 1121, 1124, 103 S. Ct. 3517, 3519, 77 L. Ed. 2d 1275, 1278–79 (1983) (per curiam).

---

[4]The expansive language is broad enough to prevent law enforcement from circumventing the *Miranda* requirements by conducting interrogations in places such as hotel rooms or squad cars. *See Orozco v. Texas*, 394 U.S. 324, 326–27, 89 S. Ct. 1095, 1097, 22 L. Ed. 2d 311, 314–15 (1969).

Following the lead of the United States Supreme Court, several circuit courts have developed nonexclusive criteria for consideration. *See United States v. Kim,* 292 F.3d 969, 974 (9th Cir. 2002) (including "(1) the language used to summon individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual" (quoting *United States v. Hayden,* 260 F.3d 1062, 1066 (9th Cir. 2001))); *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir. 1990) (including "whether the suspect was informed at time of questioning that the questioning was voluntary, that the suspect was free to leave or request officers to do so, or that the suspect was not considered under arrest"; "whether the suspect [had] unrestrained freedom of movement during questioning"; "whether the suspect initiated the contact with authorities or voluntarily acquiesced to official requests to respond to questions"; "whether strong arm tactics or deceptive stratagems were employed during the questioning"; "whether the atmosphere of the questioning was police dominated"; or "whether the suspect was placed under arrest at the termination of the questioning"). We have also utilized nonexclusive criteria for determination of custody. *State v. Miranda,* 672 N.W.2d 753, 759 (Iowa 2003) (including "language used to summon the person"; "purpose, place, and manner of interrogation"; "extent to which the person is confronted with evidence of guilt"; and "whether the person is free to leave the place of questioning").

An individual is in custody when freedom of movement is restrained to the degree comparable to formal arrest. *Beheler,* 429 U.S. at 1125, 103 S. Ct. at 3520, 77 L. Ed. 2d at 1279. The question of custody is sometimes phrased as whether there are circumstances that

objectively present "a serious danger of coercion"—coercion of a degree associated with formal arrest. *Howes v. Fields*, 565 U.S. ___, ___, 132 S. Ct. 1181, 1189, 182 L. Ed. 2d 17, 27 (2012); Tammy R. Pettinato, *The Custody Catch-22: Post-Interrogation Release as a Factor in Determining* Miranda *Custody*, 65 Ark. L. Rev. 799, 818 n.115 (2012); Bryan Taylor, *You Have the Right to Be Confused! Understanding* Miranda *After 50 Years*, 36 Pace L. Rev. 160, 180–81 (2015).

As noted by the United States Supreme Court, coercion inherent in custodial interrogations "derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained." *Minnesota v. Murphy*, 465 U.S. 420, 433, 104 S. Ct. 1136, 1145, 79 L. Ed. 2d 409, 423 (1984); *see also State v. Muntean*, 12 A.3d 518, 525 (Vt. 2010) (finding custody is present when individual is not "at liberty to terminate the interview and leave"). As observed by one authority, custody "implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation." Stephen E. Arthur & Robert S. Hunter, *The* Miranda *Rights*, in 1 *Federal Trial Handbook: Criminal* § 30:8 (4th ed.), Westlaw (database updated Dec. 2015).

The United States Supreme Court has emphasized that in determining the custody issue, the question must be approached from the viewpoint of a reasonable person in the presence of the police officer, not from the viewpoint of police officers themselves. *Yarborough*, 541 U.S. at 663, 124 S. Ct. at 2148–49, 158 L. Ed. 2d at 950–51; *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 465, 133 L. Ed. 2d 383, 394 (1995); *Stansbury*, 511 U.S. at 323, 114 S. Ct. at 1529, 128 L. Ed. 2d at 298; *Berkemer*, 468 U.S. at 442, 104 S. Ct. at 3151, 82 L. Ed. 2d at 336. The subjective and undisclosed views of police officers

conducting the interrogation are irrelevant. *Stansbury*, 511 U.S. at 324, 114 S. Ct. at 1529–30, 128 L. Ed. 2d at 299–300. The views of officers are relevant only to the extent conveyed, by word or deed, to the individual being questioned. *Id.* at 325, 114 S. Ct. at 1530, 128 L. Ed. 2d at 300.

**IV. Application of Totality-of-the-Circumstances Test of Custody.**

**A. Language Used to Summon: The Question of Implied Obligation.** We begin by discussing the first nonexclusive factor often cited in determining custody or restraint: the language used by the police to summon an individual to interrogation. *Yarborough*, 541 U.S. at 664, 124 S. Ct. at 2149, 158 L. Ed. 2d at 951. As has been noted by a leading authority, " 'invitations' or 'requests' to come to the police station for questioning may be ambiguous." William E. Ringel et al., *Searches and Seizures, Arrests and Confessions*, § 27.5 (2d ed.), Westlaw (database updated Mar. 2016).

Here, however, the record does not provide the language used to summon Schlitter. The officer testified at the suppression hearing only that a request was made that Schlitter come to the patrol office and that he voluntarily complied. There was no evidence the officer specifically advised Schlitter that his decision was up to him, that he could leave at any time during the interrogation if he chose, or that he was not under arrest. Yet, it is clear under the caselaw that even when a person appears to have voluntarily traveled to a police station to submit to interrogation, this fact does not in and of itself establish lack of custody or restraint for a number of reasons.

First, a request to appear at the police station "may easily carry an implication of obligation, while the appearance itself, unless clearly

stated to be voluntary, may be an awesome experience for the ordinary citizen." *Jefferson v. State*, 459 S.E.2d 173, 177 (Ga. Ct. App. 1995) (quoting *Dunaway v. New York*, 442 U.S. 200, 207 n.6, 99 S. Ct. 2248, 2253 n.6, 60 L. Ed. 2d 824, 832 n.6) (noting an officer's request for a person to come to the station may easily be an offer that cannot be refused, depending on the circumstances); *State v. Menne*, 380 So. 2d 14, 17 (La. 1980); *State v. Bleyl*, 435 A.2d 1349, 1357 (Me. 1981); *People v. Dross*, 551 N.Y.S.2d 1016, 1020 (Supp. Ct. 1989). The United States Supreme Court recognized the concern in *Dunaway*, where the Supreme Court recognized that individuals may not view requests to come to the station as something that they may easily refuse. 442 U.S. at 207 n.6, 99 S. Ct. at 2253 n.6, 60 L. Ed. 2d at 832 n.6. Thus, even an apparently voluntary appearance may mask coercive features.

Second, many of the cases finding the manner of arrival at the police station significant combine the voluntary nature of the summons with other facts that reinforce a finding of lack of custody or restraint. That was the case in *Mathiason*. In *Mathiason*, the defendant was told upon his arrival at the police station that he was not under arrest. 429 U.S. at 493, 495, 97 S. Ct. at 713, 714, 50 L. Ed. 2d at 718, 719. This key limiting feature of *Mathiason*—namely, that other facts supported a finding of lack of custody beyond the apparently voluntary arrival of the person at the place of interrogation—has not gone unnoticed. For example, in *Muntean*, a defendant who voluntarily arrived at the place of interrogation was nevertheless found to be in custody when he was not told that he was free to leave at any time, he was confronted immediately with evidence of guilt, the detective indicated that he was certain of his guilt, and the interrogation took place in a small, windowless polygraph room. 12 A.3d at 524.

Similarly, in *Moore v. Ballone,* the United States Court of Appeals for the Fourth Circuit noted the fact that the police emphasized that the individual was not under arrest at the station before the interrogation commenced in *Mathiason* limited the scope of the case. 658 F.2d 218, 225 (4th Cir. 1981). Along the same line of reasoning, the court in *United States v. Harrold* noted that although courts have held that an individual who voluntarily arrived at the police station was not in custody for purposes of *Miranda,* the defendants "in those cases were *also* told that they were not under arrest or were not restrained at the police station." 679 F. Supp. 2d 1336, 1345 (2009) (emphasis added). Further, as has been observed by one federal court, the *repeated reminder* that the suspect is free to leave is perhaps the most significant fact for determining if the interrogation is noncustodial. *United States v. Crawford,* 372 F.3d 1048, 1060 (9th Cir. 2004). Notably, here there was no *Mathiason* reminder, let alone repeated *Crawford* reminders that Schlitter was not under arrest or was free to leave the interrogation location.

Finally, an interrogation that commences as a noncustodial interrogation can morph into a situation that a reasonable person would conclude involves custody or significant restraint. The usual fact pattern involves an interrogation that begins in a low-key manner but then escalates into a confrontation suggesting the defendant's guilt. In these situations, an interrogation may be voluntary at the beginning but may develop into a confrontation that would give rise to a reasonable belief that the defendant cannot leave until the interrogation is completed. *See, e.g., United States v. IMM,* 747 F.3d 754, 766 (9th Cir. 2014) (noting voluntary initial contact is significant but does not end custody inquiry); *People v. Algien,* 501 P.2d 468, 470–71 (Colo. 1972); *People v. Mrozek,*

367 N.E.2d 783, 787 (Ill. App. Ct. 1977); *Commonwealth v. Magee*, 668 N.E.2d 339, 343 (Mass. 1996); *State v. Payne*, 149 S.W.3d 20, 33–34 (Tenn. 2004).

Under the thin record of this case, the conclusory testimony that Schlitter voluntarily came to the station mildly supports a finding of lack of custody. The lack of evidence of the specific language used, however, and the failure of the record to show that Schlitter was told he could voluntarily leave or end the interrogation substantially minimizes the importance of this factor. Further, as will be seen below, developments at the interrogation substantially overpower the voluntary nature of the original summons.

**B. Ensuring Voluntariness: Statement That the Individual Is Free to Leave.** A second factor often considered in determining whether an interrogation is custodial is whether the interrogatee has been told that he is not under arrest or that he is free to go at any time. The authorities discussed above demonstrate the importance of these admonitions. The Eighth Circuit has observed that

abundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test designed to discern whether a reasonable person would have understood himself to be in custody. That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview.

*United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004). Here, however, the transcript and the audio recording of Schlitter's interrogation reveal no such declarations. Although not necessarily determinative, the lack of a statement that Schlitter was not under arrest and was free to terminate the interrogation at any time is a factor cutting

in favor of custody. *See United States v. Conder*, 529 F. App'x 618, 623 (6th Cir. 2013).

Even in cases when a person is advised that he or she is free to terminate the interrogation at any time, such declarations are not determinative of the custody issue when the interrogation turns strongly accusatorial. *California v. Aguilera*, 59 Cal. Rptr. 2d 587, 593–94 (Ct. App. 1996) (holding that although the interrogatee was told he was not in custody, repeated disbelief expressed by the interrogators indicated that the individual would not be released so long as the individual continued denials). While police in this case made no statement at the time of the interrogation suggesting that Schlitter was not under arrest or was free to leave, they did repeatedly question him in a way that demonstrated disbelief, a factor cutting in favor of a finding of custody. *See, e.g., Jones v. People*, 711 P.2d 1270, 1276 (Colo. 1986); *State v. Rogers*, 760 N.W.2d 35, 56–57 (Neb. 2009).

**C. Place of Interrogation: Is It Police Dominated?** A third factor considered in determining whether an interrogation is custodial is the place of interrogation. As noted in *Miranda*, "compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." 384 U.S. at 461, 86 S. Ct. at 1621, 16 L. Ed. 2d at 716. According to *Miranda*, in the investigator's office, the investigator possesses all the advantages; "[t]he atmosphere suggests the invincibility of the forces of the law." *Id.* at 450, 86 S. Ct. at 1615, 16 L. Ed. 2d at 709. As a result, courts have noted that stationhouse interrogations should be scrutinized with great care. *United States v. Jacobs*, 431 F.3d 99, 105 (3rd Cir. 2005); *Steigler v. Anderson*, 496 F.2d 793, 799 (3rd Cir. 1974).

Here, the interrogation not only occurred at the patrol office, but in a room specially designed for that purpose. Schlitter was positioned with his back to the wall, surrounded by two steel desks, with two officers in front of him. A review of the videotaped interrogation shows that the physical characteristics of the interrogation room and the placement of the officers plainly tends to promote the type of police dominated atmosphere that animated the concerns of *Miranda.*

The State notes that the door to the room was unlocked. Yet, there is nothing in the record that suggests that Schlitter was told that fact. *See United States v. Rogers,* 659 F.3d 74, 76 (lst Cir. 2011) (describing how police told the suspect that the door was unlocked and he was free to leave the interview room); *People v. Vargas,* 971 N.Y.S.2d 624, 625 (App. Div. 2013) (noting that the suspect was told that the doors were unlocked and she could leave whenever she wanted). In any event, two officers in a small room blocking access to the door minimizes the fact that the door was unlocked. *See Payne,* 149 S.W.3d at 33 (noting that police officers blocked access to the door of interrogation room); *see also People v. Elmarr,* 181 P.3d 1157, 1163–64 (Colo. 2008) (stating the fact that the suspect was "interrogated in a small, closed-door interview room" by police officers contributed to a finding of custody); *Ramirez v. State,* 739 So. 2d 568, 574 (Fla. 1999) (finding custody established when accused was, among other things, questioned "in a small room in the police station by two detectives"). In *Harrold,* the district court noted the fact that the door to the interrogation room was unlocked, but did not give this factor much weight under circumstances similar to those presented in this case. 679 F. Supp. 2d at 1344.

The location and physical circumstances surrounding the interrogation in this case point in a direction of finding custody or

restraint. Yet, though there is an element of compulsion in the setting, the United States Supreme Court has made clear that the mere fact that an interrogation occurs at the police station is not, in and of itself, determinative of the question of custody or restraint. *Mathiason*, 429 U.S. at 495, 97 S. Ct. at 714, 50 L. Ed. 2d at 719. But nothing in *Mathiason* indicates the station house location should not be considered as a factor in the overall analysis of whether custody or restraint is present.

**D. Nature of Interrogation: Is It Accusatorial?** Another important factor to consider in determining the custody or restraint question is the nature of the interrogation. In many cases, the evolution of interrogation from ordinary fact-finding into a highly confrontational and accusatorial proceeding converts a voluntary encounter into a custodial interrogation. *See Ross v. State*, 45 So. 3d 403, 415–16 (Fla. 2010). When interrogation escalates, the key question is whether a reasonable person would feel at the time of the accusatorial questioning that they would be free to leave. *People v. Payne,* 838 N.Y.S.2d 123, 125 (App. Div. 2007).

Illustrative of accusatory questioning is *State v. Lynn*, 829 S.W.2d 553 (Mo. Ct. App. 1992). In this case, the investigation focused on defendant and her boyfriend as perpetrators of the crime. *Id.* at 554. When the police continued the questioning of the defendant despite her denials until she confessed, the Missouri court held the defendant reasonably believed she was not free to go. *Id.*; *see also Mansfield v. State*, 758 So. 2d 636, 644 (Fla. 2000) (finding custody when accused "was interrogated by three detectives at the police station, he was never told he was free to leave, he was confronted with evidence strongly suggesting his guilt, and he was asked questions that made it readily

apparent that the detectives considered him the prime, if not the only, suspect").

It is clear that an interrogation can be accusatorial even if there is not probable cause to arrest the individual. In *Moore*, the Fourth Circuit noted that even though law enforcement did not have probable cause to arrest an individual and told him he was free to leave, a persistent course of interrogation nonetheless produced a coercive environment sufficient to satisfy the custody requirement of *Miranda*. *Moore*, 658 F.2d at 221; *see also State v. Mumbaugh*, 491 P.2d 443, 449 (Ariz. 1971) (stating that a finding of no probable cause does not necessarily mean there was no "custody" for purposes of *Miranda*). Probable cause to arrest and custody are different concepts. *Lindsay v. State*, 698 P.2d 659, 662–63 (Alaska Ct. App. 1985) (finding the defendant in custody though no probable cause to arrest); *People v. Biggs*, 451 N.Y.S.2d 196, 199 (App. Div. 1982) (finding subject in custody in police car though no probable cause to arrest him). The proper focus is not on the subjective views of the police or the strength or weaknesses of their case, but is instead on whether a reasonable person in the shoes of the person being interrogated would believe he or she could terminate the interrogation and leave.

Once again, the United States Supreme Court has cautioned that mere investigatory questioning is not enough to dictate a finding of custody or restraint. *See Berkemer*, 468 U.S. at 437–38, 104 S. Ct. at 3149, 82 L. Ed. 2d at 333 (noting that questioning incident to an ordinary traffic stop is different than custodial questioning). Yet, the nature of the questioning is an important factor in the analysis. *United States v. Bassignani*, 575 F.3d 879, 885 (9th Cir. 2009) (discussing the difference between confrontational and nonconfrontational interrogation).

Here, there is no question the interrogation began in a low-key, matter-of-fact manner. It also escalated into confrontation. The tone of the interrogation shifted, and law enforcement repeatedly sought a confession from Schlitter. Further, when Schlitter unambiguously demanded the officers to stop the interrogation, they did the opposite. They persisted. He specifically asked the officers to stop three times and declared the interrogation inappropriate four times. The officers ignored his entreaties and plowed ahead. *See State v. Roble-Baker*, 136 P.3d 22, 29–30 (Or. 2006) (en banc) (noting refusal of police to stop questioning when requested to do so created the kind of police-dominated atmosphere that *Miranda* warnings were intended to counteract).

Ultimately, they pressured Schlitter to qualify his previous unqualified strong denials by stating that he did not hurt his daughter "as far as he knew" and declaring that he was frustrated with his daughter's behavior and picked her up and down repeatedly during the time when the injuries might have been inflicted on her. The accusatorial nature of the interrogation is a factor that cuts in favor of a finding of custody.

The district court responded to these facts by crediting patrol officers who testified that they were conducting an interrogation for the purposes of background information. The district court found that the officers had no plans to take Schlitter into custody because there was no evidence with which to charge him with a crime.

The subjective views of the police officers have no direct bearing on what a reasonable person would conclude from the circumstances. *Stansbury*, 511 U.S. at 324, 114 S. Ct. at 1529–30, 128 L. Ed. 2d at 299–300. *Miranda* rights are personal to the individual. That is why the test is what a reasonable person in the shoes of the person being interrogated

would believe with respect to the custodial issue. The subjective belief on custody of the police officer, unless communicated to the individual being questioned, is of very little value in determining what a reasonable interrogatee would believe. *State v. Murray*, 510 N.W.2d 107, 110 (N.D. 1994) (stating the fact that the officer planned to arrest the accused irrelevant when not communicated to the accused). Here, there was no such communication and indeed, just the opposite in light of the officer's declarations that the bruising occurred when his daughter was in his care. Thus, the trial court's focus on the subjective state of mind of police officers does nothing to mitigate the accusatorial nature of the interrogation.

**E. Honoring Request to Call Attorney About Polygraph Examination After Conclusion of Interrogation.** Another factor in this case is the significance of the officers honoring Schlitter's request that he be allowed to call his attorney when his interrogators wanted to conduct a polygraph test. Yet, by the time the officers asked for a polygraph test, the interrogation was essentially over.[5] The officers had achieved all they could from the interrogation of Schlitter. The question here is whether Schlitter felt free to leave *at the time the questioning turned* accusatorial at the patrol office in the environment in which he found himself. The fact that he repeatedly asked the interrogators to stop asking him questions—and their determination to press on—suggests that at the key point of the interrogation, a reasonable person in Schlitter's shoes would not have believed he was free to leave the interrogation room. He

---

[5]Schlitter also invoked his right to counsel generally. The law enforcement officers refused to terminate the questioning, however, giving rise to a potential violation of *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S. Ct. 1880, 1883, 68 L. Ed. 2d 378, 384 (1981). This *Edwards* question was not raised in this case.

repeatedly asked the officers to stop, and his requests were repeatedly not honored. The officers appeared determined to press the interrogation, and at the accusatorial point of the questioning, a reasonable person might not have believed they could just get up and leave until the interrogation was concluded.

**F. Departure at Conclusion of Interrogation.** Another feature of this case emphasized by the State is that Schlitter was not arrested at the conclusion of the interrogation. In *Mathiason*, the individual who confessed was not charged at the conclusion of the questioning, a fact that the Supreme Court found significant. 429 U.S. at 495, 97 S. Ct. at 714, 50 L. Ed. 2d at 719. But in *Mathiason*, the suspect was told he was not under arrest at the beginning of the interrogation, confessed within about five minutes, and there was "no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way." *Id.* at 493, 495, 97 S. Ct. at 713, 714, 50 L. Ed. 2d at 718, 719. Here, a suspect is not told he is not under arrest or that he can terminate the interrogation, is placed in a confined room used for interrogations, has his exit blocked by patrol officers, is confronted with accusatorial questioning, and is subject to repeated and determined questioning in response to three unheeded demands that the interrogation "stop!" The facts are obviously in strong contrast to those in *Mathiason*.

Further, the fact that Schlitter was not charged for another fifteen months is of little moment on the question of what Schlitter reasonably thought *at the time of the accusatorial interrogation.* Again, the question is not what the *police* may have thought after the interrogation was concluded (or at any time, for that matter): the question is what would a reasonable person in Schlitter's position have concluded about his

custodial status at the time he faced accusatorial interrogation and made repeated unheeded demands to stop the interrogation. *See State v. Aynes*, 715 N.E.2d 945, 950 (Ind. Ct. App. 1999) (finding despite fact that defendant drove himself to police station for interrogation and left at end, interrogation was custodial in light of nature of interrogation and fact that defendant was never told he was free to leave).

**G. Conclusion.** In light of the totality of the circumstances, I conclude that the interrogation here became custodial when law enforcement officers began focusing in on Schlitter as the possible perpetrator of the crime in this case. I note in particular the failure of law enforcement to advise Schlitter that he was not under arrest, the physical circumstances of the interrogation, the confrontational nature of the questioning by police, and importantly, the refusal of the officers to discontinue the questioning when Schlitter repeatedly demanded that they stop. After his repeated requests to stop were not honored, a reasonable person would have believed he was not free to terminate the interrogation. I would thus hold that the district court erred in failing to suppress statements made beyond that point in the interrogation under both the United States Constitution and under the due process clause of article I, section 9 of the Iowa Constitution.

**V. Harmless Error.**

Constitutional error is harmless only if it may be shown to be harmless beyond a reasonable doubt. *State v. Turner*, 630 N.W.2d 601, 609 (Iowa 2012). The record in this case shows, however, that the prosecutor used Schlitter's interrogation responses to persuade the jury of his guilt. An incriminating response is any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial. *Rhode Island v. Innis*, 446 U.S. 291, 297, 100 S. Ct. 1682, 1688,

64 L. Ed. 2d 297, 305 (1980).   At trial, the prosecutor emphasized Schlitter's lack of "outrage" in the interrogation.  Further, the prosecutor additionally emphasized in closing argument to the jury that in the interrogation Schlitter admitted abusing his daughter when he stated that he was frustrated with her on Sunday, March 21, because she was not eating her lunch.   The prosecutor also argued that in the interrogation Schlitter admitted that he might have picked up his daughter in a rough manner.  In a close case like this one, we cannot say that the admission of evidence from the interrogation was harmless given the reliance placed on the evidence obtained after the March 30 interrogation turned adversarial by the prosecution.   As a result, Schlitter's motion to suppress incriminating statements made after the interrogation turned adversarial should have been granted.[6]

Wiggins and Hecht, JJ., join this concurrence in part and dissent in part.

---

[6]As a result of my disposition of the custody issue, it is not necessary to consider Schlitter's due process claim that the statements were involuntary.